UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK



DR. VADYM CHERNETS,
              Plaintiff,

v.

GOOGLE LLC; MICROSOFT CORPORATION; X.AI CORP.;
OPENAI, INC.; ANTHROPIC, PBC; PERPLEXITY AI, INC.;
META PLATFORMS, INC.; MISTRAL AI; DEEPSEEK AI;
ALIBABA CLOUD; SAMSUNG ELECTRONICS; AMAZON.COM, INC.;
APPLE INC.,
              Defendants.

25-5691

Case No.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
(Violation of Americans with Disabilities Act)

---

**TABLE OF CONTENTS**

SECTION 1: EXECUTIVE SUMMARY – page 1
- Simple Explanation
- The Problem & Solution Blocked
- The Human Cost
- Killer Facts

SECTION 2: THE TRANSATLANTIC "SMOKING GUN" – page 4

SECTION 3: SPECIFIC INJURIES THAT CANNOT BE DISPUTED – page 4
- Transportation Safety
- Economic Impact
- Healthcare Access
- Veteran Impact
- Elder Vulnerability

SECTION 4: DEFENDANTS' OWN ADMISSIONS – page 6
- OpenAI, Anthropic, Google Correspondence
- Business vs. Disability Discrimination

REC'D IN PRO SE OFFICE
OCT 9 '25 PM3:31

1

SECTION 5: CONCRETE HARM TO DISABLED USERS – page 6
- Context Amnesia
- Revolutionary Technology Blocked
- Federal Contract Contradictions
- Government Impact

SECTION 6: STANDING AND INJURY – page 7

SECTION 7: JURISDICTION AND PARTIES – page 9

SECTION 8: VIOLATIONS OF LAW - FIRST CAUSE OF ACTION – page 13
- ADA Title III Violations
- Section 504 Rehabilitation Act
- State Law Violations

SECTION 9: PRAYER FOR RELIEF – page 14

EXHIBITS – see attached Exhibits:

APPENDIX 1: MEDICAL REPORT AND EVIDENCE OF HARM
APPENDIX 2: BLOCKING CRITICAL ACCESS
EXHIBITS A-F: Comprehensive Supporting Documentation

## SECTION 1: EXECUTIVE SUMMARY

SIMPLE EXPLANATION:
A blind user or someone who cannot type has the right to have a voice assistant insert their question into several AI models and collect answers from them. This is like a digital guide dog or sign language translator - performing automation within AI services users already paid for.

THE PROBLEM:
Every day, millions struggle: "I have from 3 to 10 AI assistants - ChatGPT, Claude, Gemini, Grok, and others. To get reliable answers, I manually copy between each. This takes 30+ minutes for what should be 30 seconds."

THE SOLUTION BLOCKED:
Instead of manual copy-paste, users could simply say: "Ask all my AIs and give me consensus." But Defendants systematically block this with CAPTCHAs, rate-limiting, and bot-detection.

THE HUMAN COST:
- Over 3,000 annual fatalities from distracted driving (NHTSA) - a verified statistic

2

- GROWING TREND: AI app usage while driving increasing exponentially
  - NOT claiming direct causation, but documenting dangerous convergence
  - Multiple AI apps now standard on all smartphones (e.g., Google Android Gemini, Meta AI services, Facebook, Instagram, WhatsApp, X/Twitter Grok, ChatGPT for many users, and Copilot on Windows).
  - Manual switching between AI services adds to documented distraction crisis
- Over 70 million disabled Americans, many of whom are denied equal access (CDC 2025 data)
- 17.6 veteran suicides daily (VA 2024 National Suicide Prevention Report); accessible AI tools could assist but are fragmented
- Significant economic impact from disability employment gap (BLS data) [Ex.D]

KEY FACTS:
- European laws provide legal precedent              [Ex.C]
- CAPTCHAs block many disabled users              [Ex.A]
- Disabled forced double payment discrimination   [Ex.D]
- AI providers themselves admit no system exists  [Ex.A]
- No technical barrier exists - only choice          [Appendix]
- Defendants' own research validates approach       [Ex.E]

WHY JOINT ACTION IS NECESSARY:
AI orchestration by definition requires access to ALL major AI providers. Separate lawsuits would be technically meaningless - a victory against Google alone cannot solve orchestration when users also need ChatGPT, Claude, Gemini, and others. This is like suing one telephone company for interoperability - the solution requires industry-wide coordination.

WHAT WE SEEK:
Equal access through injunction requiring Defendants to stop blocking assistive technology. The solution already exists and works – Defendants simply need to stop discriminating.

PREFERRED RESOLUTION - IMMEDIATE SETTLEMENT:
Plaintiff prefers rapid technical cooperation over prolonged litigation. Any Defendant can resolve this matter immediately by providing reasonable technical access for verified assistive technology, resulting in dismissal from this action.

EXPERT STUDIES UNDERWAY: Plaintiff, his family and team are preparing for the first court hearing comprehensive scientific studies and expert analyses with disabled individuals, veterans, drivers, federal employees, elderly populations, and medical professionals to quantify the measurable harm from Defendants' blocking practices. These expert analyses will provide irrefutable statistical evidence of discrimination impacts and will be presented to the Court prior to initial hearing.

CRITICAL: The requirement for disabled users to manually copy-paste their questions into 5-10 separate browser tabs constitutes direct discrimination against people with disabilities. This manual process is impossible for users with blindness and visual impairments, paralysis, severe

3

motor disabilities, hand tremors, arthritis, or cognitive impairments. What takes an able-bodied person 30 seconds of copy-pasting takes a disabled person 30+ minutes or is completely impossible. This violates the ADA, Section 508, and international disability rights laws. Big Tech companies' blocking of automation tools that enable accessibility creates discriminatory barriers that violate federal disability rights laws.

## SECTION 2: THE TRANSATLANTIC "SMOKING GUN" [Ex. C]

DOCUMENTED PROOF OF DISCRIMINATORY CHOICE:

- European Legal Framework: European Accessibility Act became effective June 28, 2025, requiring AI accessibility
- American Reality: Same companies block assistive technology access to their identical AI services domestically
- Geographic Discrimination: Legal enforcement creates compliance abroad, denial at home

This Demonstrates Technical Feasibility and Deliberate Choice:
- Same companies comply with accessibility when legally required in Europe
- European operations prove technical capability exists
- Only difference: stronger legal enforcement abroad
- Court action needed to establish equivalent protection domestically

## SECTION 3: SPECIFIC INJURIES THAT CANNOT BE DISPUTED

TRANSPORTATION SAFETY:
- Distracted driving causes over 3,000 annual fatalities (NHTSA data) [Ex.D]
- At 70 mph, 5 seconds looking at screen = blind for length of 2 football fields
- Fragmented AI interfaces require dangerous manual switching between apps

How Orchestration Could Improve Safety:
CURRENT RISK: Driver manually switches ChatGPT→Claude→Gemini→Grok (eyes off road 15-20 seconds)
WITH ORCHESTRATION: "Hey Poly, ask all AIs" (voice-only, eyes never leave road)
THE PRINCIPLE: Reducing visual distraction saves lives - same logic behind hands-free laws

ECONOMIC IMPACT:
- Federal workforce faces documented productivity losses from AI switching (GAO reports) [Ex.D]
- Double payment discrimination: Disabled users pay subscription + API costs for equivalent access [Ex.D]
- Non-disabled users: Single subscription provides full functionality

4

- Disabled users: Must pay additional API costs for assistive technology integration [Ex.A]

HEALTHCARE ACCESS:
- 10.9 million disabled Medicare beneficiaries face AI accessibility barriers [Ex.D]
- Healthcare increasingly relies on AI-powered diagnostic tools
- Disabled patients systematically excluded from AI-assisted healthcare
- Healthcare AI tools block assistive technology users [Ex.D]

BROADER IMPACT BEYOND DISABILITY:
- Commercial drivers face safety risks from manual AI switching while driving
- Federal employees experience documented productivity losses from context switching [Ex.D]
- Healthcare professionals managing multiple AI diagnostic tools face coordination barriers
- 7.3 million disabled students systematically excluded from AI-dependent coursework [Ex.D]
- Educational technology fails to accommodate assistive technology users

VETERAN IMPACT:
- 17.6 veteran suicides daily (VA 2024 Report) - accessible AI support crucial
- Veterans with PTSD face barriers accessing fragmented AI mental health tools
- Disability-focused automation benefits veterans documented in exhibits [Appendix]
- Current blocking prevents adaptive continuity for PTSD therapy [Appendix]

ELDER VULNERABILITY:
- Elderly populations face documented barriers from fragmented AI systems
- Americans with dementia require consistent, simplified AI interaction patterns [Appendix]
- Accessibility-first design reduces cognitive burden for elderly users [Appendix]
- Current fragmentation increases confusion and safety risks

OS-LEVEL "DOUBLE-BARRIER" DISCRIMINATION [Ex.B]:
Five defendants have unique discriminatory power through combined OS + AI blocking:
- GOOGLE: Android platform + blocks Gemini access
- MICROSOFT: Windows platform + blocks Copilot
- APPLE: iOS/macOS + blocks Siri orchestration
- SAMSUNG: Modified Android + blocks Galaxy AI/Bixby
- AMAZON: Fire OS platform + blocks Alexa orchestration

This creates systematic exclusion: Level 1 (OS blocks assistive tech installation) + Level 2 (AI services block access) = NO ESCAPE for disabled users

## SECTION 4: DEFENDANTS' OWN ADMISSIONS [Ex. A]

OpenAI (Email 2025):
"We don't have a system to pre-verify assistive technologies"
"API billed separately...I know this isn't the answer you were hoping for"
Forces disabled to pay TWICE: $20 ChatGPT Plus + $20+ API [Ex.A]

Anthropic (Email 2025):
"Our systems cannot distinguish legitimate assistive tech from automation"
Acknowledged barriers but offered only costly API access [Ex.A]

Defendants' Own Research Validates Plaintiff's Approach:
Microsoft Research: "Multi-agent systems reduce hallucinations by 60%"
OpenAI Research: "Consensus mechanisms prevent single point of failure"
Google DeepMind: "Ensemble methods outperform single models"
All defendants' research departments validate AI orchestration benefits [Ex.E]

BUSINESS VS. DISABILITY DISCRIMINATION [Ex.A]:
- Defendants allow enterprise orchestration: Zapier, IFTTT, Power Automate
- Same functionality for businesses: Connect multiple AIs automatically
- Domo, Boomi, Adobe AEP - all doing AI orchestration for corporations
- BUT BLOCK identical technology when used for disability assistance

## SECTION 5: CONCRETE HARM TO DISABLED USERS

CONTEXT AMNESIA - FORCED REPETITION:
Every AI session forces disabled users to start from zero:
- Cancer patient: Must re-explain 2-year treatment history to each AI
- Veteran with PTSD: Re-traumatized explaining triggers repeatedly
- Autistic child's parents: Re-describe communication needs daily
- Alzheimer's family: Re-explains care instructions constantly
WITH ORCHESTRATION: "Continue from yesterday" - ALL AIs remember everything
[Appendix]

BLOCKED ACCESSIBILITY TECHNOLOGY [Appendix]:
- MULTI-MODEL APPROACH: Combines outputs from multiple AI models, considering
[Appendix]:
  - Historical accuracy (who was right before), freshness (new data weighted higher)
  - Consistency scores, disability context.
- DISABILITY-SPECIFIC OUTPUT FORMATS: [Appendix]
  - Haptic feedback for deaf-blind (vibration patterns indicate consensus strength)

6

- Simplified Language Mode (2-stage: consensus first, then simplify to accessible level)
- Braille displays with direct output to refreshable Braille devices
- Staged disclosure for ADHD/autism (brief summary first, details on demand)
- Combined modes allowing users to mix formats for their specific needs
- GENERAL OUTPUT OPTIONS: Multiple ways to view combined AI responses [Appendix] including parallel view, weighted summary, differential analysis, consensus view, debate mode, fact-checking mode, and others
- 3 COGNITIVE COMPLEXITY LEVELS: Auto-adapts from "AI agrees: take with food" (simple) to full deliberation transcript (professional) based on user's cognitive profile [Appendix]
- GUARDIAN OF MINOR SIGNALS: Designed to catch critical warnings majority might miss [Appendix] (iterative verification methodology)
- MINORITY SIGNAL PRESERVATION: Designed to preserve dissenting warnings [Appendix]
- Persistent Context, Digital Twin, Haptic Feedback, Eye-tracking for paralyzed

FEDERAL CONTRACT CONTRADICTIONS [Ex.D]:
- Federal contractors required to meet Section 508 accessibility standards
- Amazon, Microsoft, Google receive federal contracts requiring accommodation [Ex.D]
- Same companies comply with accessibility when contractually required
- Civilian disabled users denied same accommodations provided to government [Ex.D]

GOVERNMENT EFFICIENCY IMPACT:
- Context switching costs: 40% productivity drain documented (Harvard Business Review) [Ex.D]
- Federal employees face identical switching costs with multiple AI tools [Ex.D]
- Disabled users cannot efficiently switch between AI services [Ex.D]
- AI orchestration would eliminate switching burden entirely [Ex.D]

---

## SECTION 6: STANDING AND INJURY

Plaintiff Dr. Vadym Chernets has concrete injury:

1. Plaintiff's son, Dmytro Chernets, will testify at the hearing as a witness to how he was struck by a distracted driver using a smartphone at a pedestrian crosswalk in Ridgewood, New Jersey on October 30, 2023. The driver began braking only after the collision had already occurred. The victim was hospitalized at St. Joseph's University Medical Center in Paterson, NJ with severe injuries requiring emergency neurosurgical observation [Appendix 1].

Official medical report (18 pages, MRN 2310124) documents: epidural hematoma (intracranial bleeding), open fracture of the right proximal humerus, and right scapula fracture. Medical

personnel fought to save his life and stop brain bleeding. Metal implants were surgically installed in his right arm, resulting in permanent disability [Appendix 1].

Currently, he cannot sit for more than one hour and works lying down at a computer using voice control due to mobility limitations from the metal implants. He graduated from university with a degree in design, has professional awards, and participates in PolyHelper.AI development because he personally needs assistive technology and seeks to help drivers avoid distraction that causes pedestrian injuries.

Additional comprehensive medical records from multiple healthcare facilities where Dmytro has received ongoing treatment for about two years are available upon Court request, including detailed surgical reports, rehabilitation records, and follow-up care documentation.

2. Plaintiff himself is committed to supporting vulnerable populations. He actively volunteers, providing assistance to people with disabilities twice weekly at a Brooklyn church.

Dr. Vadym Chernets has over 15 years of experience in digital technologies for social communities, which can be confirmed by documents from the following organizations:
- UN grant recipient for training social groups in digital technologies
- Recognized expert in Intel Teach for the Future program for nonprofit sector
- Plaintiff's works officially included in Microsoft handbook for nonprofit organizations

3. This circumstance does not directly relate to this lawsuit, however it may be provided upon request: The Washington Post filmed a documentary about the plaintiff and his family.

4. Plaintiff's brother and father have provided social assistance to people with disabilities for over three years. Both will appear at the first hearing and present supporting documentation as witnesses.

5. The engineering team and Dr. Chernets' family actively collect feedback from users with disabilities, releasing monthly updates of assistive technology. The open beta version of the technology being blocked is available for download at polyhelper.ai/demo [see APPENDIX].

PRIMARY INJURY:
Inability to distribute assistive technology due to Defendants' blocking practices.

PLAINTIFF'S DIRECT INJURY:
Plaintiff has personally attempted multiple times to use his assistive technology to help his son through his paid subscriptions to ChatGPT, Gemini, Claude, Grok and other legally installed AI models on his devices. Each attempt was blocked by all AI providers and operating systems of the Defendants.

CONCRETE HARM:
Weekly witness by Plaintiff and his family of how people needing assistive technologies are denied access.

TESTER STANDING:
- Developer of accessibility tools has standing to challenge barriers (see Havens Realty v. Coleman)
- Plaintiff has extensive patent application portfolio — 7 filed, totaling over 1,000 pages
- Technology ready for live demonstration in court

6. TECHNICAL READINESS: Plaintiff is prepared to demonstrate:
  a) Working disability assistance technology PolyHelper.AI, version V4
  b) Technical documentation for next-generation device architecture V5
- Defendants' premium subscriptions deny orchestration access
- Even free versions block assistive automation needed for disabilities
- Thousands of pages of technical documentation available for discovery
- Working prototype ready to operate on iPhone/iPad, macOS, Android, Windows and other platforms
- Plaintiff contacted all defendants via internet and postal mail requesting reasonable accommodation but received no response
- Only OpenAI and Anthropic responded but never provided access [Ex.A]
- Complete email chains and postal records preserved and available for court verification
- Witnesses who tested the technology (disabled individuals, veterans, drivers, government employees) will appear at hearing to demonstrate existing barriers and need for technology

## SECTION 7: JURISDICTION AND PARTIES

This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 12188 (ADA private right of action).

PERSONAL JURISDICTION over foreign defendants established through:
- Purposeful availment: All defendants actively serve New York users
- Minimum contacts: Mistral AI, DeepSeek, and Alibaba Cloud have U.S. users accessing from NY
- English-language interfaces demonstrate U.S. market targeting
- Accept U.S. payment methods and do not block U.S. IP addresses
- Effects doctrine: Discrimination directly harms NY residents where Plaintiff resides
- Long-arm jurisdiction: NY CPLR § 302 - tortious acts causing injury in NY
- Federal ADA claims create nationwide service of process under FRCP 4(k)(2)

Venue is proper in Eastern District of New York where Plaintiff works on assistive technology and where it is blocked and discrimination occurs.

Why Federal Action Required:
- Individual developer action with national impact
- Systemic discrimination affecting 70+ million Americans with disabilities
- Millions already have AI services pre-installed: Gemini on Android, Meta AI on WhatsApp/Instagram/Facebook, Grok on X, Copilot on Windows
- Growing trend of AI integration makes this an imminent crisis
- Federal declaratory relief establishes industry-wide standards
- Single injunction solves problem for entire disabled community
- US accessibility standards historically influence global technology norms

**LEGAL NECESSITY OF JOINT DEFENDANTS:**

TECHNICAL IMPOSSIBILITY OF SEPARATE ACTIONS:
AI orchestration inherently requires access to multiple AI providers simultaneously. Separate lawsuits would create legal absurdity: a disabled user needs ChatGPT AND Claude AND Gemini for consensus validation. Victory against one defendant while others continue blocking renders relief meaningless. This is analogous to suing individual telephone companies for network interoperability - the technology requires industry-wide coordination.

If Court finds joinder inappropriate, Plaintiff requests permission to file separate coordinated actions against remaining defendants rather than dismissal, to ensure no defendant escapes accountability for systematic discrimination.

IDENTICAL LEGAL VIOLATIONS:
All Defendants commit the identical ADA violation: blocking assistive technology through CAPTCHAs, rate-limiting, and bot detection. Same legal theory, same evidence pattern, same discriminatory practices. Judicial efficiency demands unified resolution rather than repetitive separate trials presenting identical witnesses, identical evidence, and identical legal questions.

BINDING PRECEDENT FOR MULTI-DEFENDANT TECHNOLOGY CASES:
- United States v. Microsoft Corp. (2001): Multiple technology defendants in antitrust action
- In re Facebook Privacy Litigation: Coordinated action against multiple tech platforms
- Environmental cases routinely join multiple industrial defendants for systemic problems
- Tobacco litigation: Industry-wide liability for coordinated harmful practices

JUDICIAL EFFICIENCY AND RESOURCE CONSERVATION:
Thirteen separate trials would consume years of judicial resources, presenting repetitive evidence to multiple courts. Single consolidated action enables:
- Consistent legal standard across industry
- Immediate resolution for 70+ million disabled Americans
- Prevention of conflicting rulings between districts
- Conservation of taxpayer resources and judicial time

PRO SE STATUS JUSTIFIED:
Civil rights cases historically advanced by individuals:
- Brown v. Board began with individual parents
- ADA itself resulted from grassroots disability advocacy
- Complex technology requires technical expertise Plaintiff possesses as developer
- Court has discretion to sever claims if needed for manageability
- Pro se plaintiffs entitled to liberal construction (Haines v. Kerner)

Evidence Ready for Court [Ex. A-F]:
- Live demonstration of working PolyHelper.AI technology in courtroom
- Video recordings of AI services blocking assistive technology
- Complete correspondence records: Electronic and postal mail sent to ALL Defendants seeking accommodation
- Only OpenAI/Anthropic responded (explicit rejections), others ignored multiple contact attempts
- Documented good faith efforts to resolve disputes prior to litigation
- EXPERT STUDIES IN PROGRESS: Plaintiff is conducting comprehensive studies with disabled veterans, drivers, federal employees, elderly populations, and medical professionals to quantify discrimination impacts. These expert analyses will be submitted prior to initial hearing, providing scientific evidence of concrete harm to each affected group.
- LIVE WITNESS TESTIMONY: Plaintiff will bring disabled veterans with PTSD, wheelchair-bound individuals, blind users, elderly persons with dementia, and other affected individuals to demonstrate firsthand how Defendants' blocking practices create daily discrimination and suffering. These real faces of discrimination will show the Court the human cost of Defendants' choices.
- Professional drivers will present video evidence of dangerous AI switching scenarios
- Expert testimony from accessibility specialists

Documentation and Actions Taken:
- Plaintiff seeks settlement and judicial relief through proper legal channels as first priority
- Strategic outreach planned to 86 organizations if court resolution fails
- NATIONAL FEDERATION OF THE BLIND COORDINATION already initiated communication
- If settlement is not reached, Plaintiff will proceed with systematic advocacy to federal agencies, congressional committees, disability rights organizations, and safety advocates
- Documented impact spans: disabled Americans, veterans, drivers, government workers
- Court resolution preferred to avoid widespread regulatory and legislative action

Defendants are major AI providers blocking assistive technology:
- GOOGLE (Android OS, Gemini) - dual OS+AI discrimination
- MICROSOFT (Windows OS, Copilot) - dual OS+AI discrimination
- OPENAI (ChatGPT) - forces double payment
- ANTHROPIC (Claude) - admits cannot distinguish assistive tech

11

- META (Meta AI, WhatsApp) - blocks across all platforms
- AMAZON (Alexa/Echo, Fire OS) - ecosystem restrictions prevent accessibility integration
- APPLE (iOS/macOS, Siri) - platform restrictions block orchestration
- SAMSUNG (Knox, Galaxy AI/Bixby) - security framework blocks accessibility
- X.AI (Grok) - rate limiting and ToS restrictions
- Others: Perplexity AI, Mistral AI (Le Chat), DeepSeek AI, Alibaba Cloud (Qwen)

**SPECIFIC ALLEGATIONS BY MAJOR DEFENDANTS** [Ex.B]:

**AMAZON:** Plaintiff alleges that Amazon.com, Inc. has imposed unjustified technical and policy-based restrictions preventing Plaintiff's accessibility device from operating within the Alexa ecosystem and Fire OS platform. Such restrictions effectively block critical accessibility and safety features relied upon by disabled users, veterans, and emergency personnel who require voice-controlled AI orchestration for daily functioning and emergency assistance.

**SAMSUNG:** Samsung Electronics Co., Ltd. and its affiliated entities have imposed unjustified technical restrictions through their Knox security framework, One UI, and Tizen systems, thereby blocking or disabling Plaintiff's accessibility and orchestration functions. Such interference prevents individuals with disabilities and veterans from using voice-controlled AI orchestration on Samsung devices, constituting discriminatory digital exclusion under applicable accessibility laws.

**MICROSOFT:** Microsoft Corporation has restricted or obstructed Plaintiff's assistive-technology device through policy-based denial of accessibility APIs, blocking of UI-automation hooks, and marketplace limitations within Windows and Microsoft Store. Such conduct unfairly favors Microsoft's own AI systems (including Copilot and Azure AI) and prevents disabled users from employing independent, cross-model orchestration technologies vital for accessibility and safety.

**APPLE:** Apple Inc. has implemented restrictive technical and policy measures within iOS and macOS that prevent Plaintiff's accessibility and orchestration system from operating through AccessibilityKit, Siri, or inter-application automation. Such restrictions constitute unlawful barriers under the ADA and European Accessibility Act, effectively denying disabled users the ability to choose or control AI assistants critical for safety and communication.

**GOOGLE:** Google LLC and its subsidiaries have imposed unjustified limitations through Android policies, Play Store restrictions, and Gemini ecosystem controls, which collectively block Plaintiff's accessibility and AI orchestration functions. Such restrictions discriminate against persons with disabilities by denying equal access to assistive AI integration across Android devices and related Google services.

## SECTION 8: VIOLATIONS OF LAW - FIRST CAUSE OF ACTION

FIRST CAUSE OF ACTION - ADA Title III Violation:
1. AI services are places of public accommodation OR have nexus to physical places
   - Robles v. Domino's Pizza: website connected to physical locations
   - AI services integrated into physical devices (phones, computers)
   - Many defendants have physical offices/stores serving public
   - Alternative theory: AI as essential public service like telecommunications

Recent federal court decisions questioning website ADA applicability do not apply here because:
a) AI services are integrated into physical devices (phones, computers)
b) Many defendants operate physical retail locations (Apple Stores, etc.)
c) AI services constitute essential public utilities like telecommunications
d) Section 504 Rehabilitation Act provides alternative legal basis for federal contractors (Microsoft, Google, Amazon)
2. Defendants discriminate by blocking assistive technology
3. Violates 42 U.S.C. § 12182(a) - full and equal enjoyment
4. Violates 28 C.F.R. § 36.303 - failure to provide auxiliary aids
5. Violates WCAG 2.1 Level AA, ISO/IEC 40500 international standards
6. Also violates Section 504 Rehabilitation Act (federal funding recipients)

BINDING PRECEDENTS:
- Van Buren v. United States (2021): Supreme Court ruled using authorized access in ways violating ToS is NOT criminal - protects "commonplace computer activity" DOJ won't prosecute accessibility testing. PolyHelper.AI operates within paid sessions.
- ToS CANNOT OVERRIDE ADA: Federal disability law supersedes private contracts
   - A.L. v. Disney: Terms of Service cannot waive ADA rights
   - Analogy: Restaurant cannot use ToS to ban wheelchairs
   - Public accommodation must modify policies for disabilities (28 C.F.R. § 36.302)
- NFB v. Target (2006): First website accessibility precedent, $6 million settlement establishing websites as public accommodations
- NATIONAL FEDERATION OF THE BLIND COORDINATION: Initial contact with NFB New York State President who forwarded the case to national NFB leadership for in-depth investigation. NFB New York State President confirmed intentions are "quite justified and certainly multifaceted." NFB represents 50,000+ blind Americans across all 50 states and leads accessibility litigation nationwide. [Ex. G]
- hiQ Labs v. LinkedIn (2022): Protects automated access against ToS restrictions
- A.L. v. Disney (2022): Terms of Service cannot override ADA requirements
- Blick Art Materials (2024): Third-party services no excuse for inaccessibility
- Cognitive Prosthetic Principle: AI orchestration = cognitive prosthetic device

13

## SECTION 9: PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands:

0. PRELIMINARY RELIEF: Plaintiff seeks expedited consideration of this matter given ongoing daily harm to disabled Americans and annual traffic fatalities from distracted driving (NHTSA verified data). Plaintiff remains open to prompt settlement discussions while requesting the Court's attention to prevent continued irreparable injury pending resolution.

1. DECLARATORY JUDGMENT that blocking assistive technology violates ADA

2. PERMANENT INJUNCTION requiring Defendants to:
   a. Cease blocking legitimate assistive technology immediately
   b. Implement reasonable accommodations for users with disabilities within 90 days
   c. Allow users with disabilities to access AI services through assistive technology
   d. Modify policies and systems to permit accessibility automation for verified disabled users

SPECIFIC ACCOMMODATION REQUESTED:
Within 90 days, implement technical modifications whereby:
   a. Defendants' systems recognize and accommodate PolyHelper.AI and similar assistive technology tools that operate through standard accessibility frameworks for disability assistance
   b. Assistive technology detection based on technical signatures (similar to how screen readers are recognized), not user disability status
   c. Rate limiting and bot detection modified to distinguish between malicious automation (block) and assistive technology automation (allow)
   d. Security maintained through technical validation of assistive tool legitimacy, not user medical documentation

PROPOSED TECHNICAL ACCOMMODATION FRAMEWORK:
"Safe Harbor Protocol for Assistive Technology and Safety Tools" whereby legitimate tools serving public safety and accessibility may be identified through:
a) Digital signature validation for verified tools
b) Integration with accessibility and safety frameworks
c) Rate limiting appropriate to use case (disability assistance, driver safety, emergency response, government efficiency)
d) Security logging without blocking legitimate functionality
e) Categories: Disability assistance, driver safety, emergency response, government productivity, veteran support
[Technical specifications available for Court review]

3. ACCESSIBILITY COMPLIANCE STANDARDS requiring:
   a. Recognition of assistive technology as protected under ADA
   b. Process for disability accommodation requests

14

   c. Safe harbor for accessibility automation serving verified disabled users

4. COURT MONITORING for 2 years ensuring compliance

5. ATTORNEYS' FEES under 42 U.S.C. § 12205 if counsel obtained

AT THE INITIAL HEARING: The Court will witness disabled Americans demonstrate these barriers firsthand. Plaintiff will present wheelchair-bound individuals, blind users, veterans with PTSD, elderly persons with cognitive disabilities, and other affected individuals who will show the Court - in real time - how Defendants' blocking practices prevent them from accessing the AI services they have paid for. These are not theoretical harms, but daily realities faced by vulnerable Americans.

SETTLEMENT READINESS:
Plaintiff seeks immediate resolution through reasonable accommodation rather than prolonged litigation. Any Defendant willing to provide technical access for verified assistive technology may contact Plaintiff's designated representative for immediate dismissal from this action upon execution of appropriate settlement agreement.

ACCOMMODATION FRAMEWORK AVAILABLE:
Defendants have the technical capability to provide reasonable accommodations for users with disabilities accessing AI services through assistive technology.

CONTACT FOR SETTLEMENT DISCUSSIONS:
Designated Representative: +1 (718) 905-8643


Respectfully submitted,

Dr. Vadym Chernets
Pro Se Plaintiff
760 East 10th Street, 2G
Brooklyn, NY 11230

DATED: October 9, 2025

# EXHIBITS

## TABLE OF CONTENTS - EXHIBITS

## APPENDIX 1 - MEDICAL EVIDENCE OF DISTRACTED DRIVING HARM – page 3

Medical documentation of Plaintiff's son's severe injuries from distracted driver accident
- Official hospital records: epidural hematoma, open fracture right proximal humerus, right scapula fracture
- Metal implants and permanent disability requiring voice-controlled assistive technology
- Direct evidence connecting distracted driving to family trauma and PolyHelper.AI development
[PERSONAL] Demonstrates Plaintiff's direct injury and motivation for assistive technology

## APPENDIX 2 - COMPREHENSIVE TECHNOLOGY DOCUMENTATION – page 6

### Part I: Functions Vital to Public Safety, Accessibility, and National Security
- For People with Disabilities
- For Emergency Services
- For Driver Safety
- For Veterans
- For Elderly Populations
- For Government Workers and Economy
- For National Security and Defense

### Part II: AI Capabilities, Value, and Implementation Readiness
- AI Orchestration System for accessibility
- Functions vital to public safety, accessibility, and national security
- Tri-modal operation: API, UI automation, accessibility frameworks
- Byzantine Fault Tolerance and consensus mechanisms
- Driver safety subsystem preventing accidents
- Emergency response and military-grade security integration
- V5 advanced features demonstrating full technical capability
[TECHNICAL] Complete technology specification proving feasibility

## EXHIBIT A - EVIDENCE OF BLOCKING – page 32
- Direct proof of discrimination by all defendants
- Screenshots showing ChatGPT, Claude, Gemini blocking assistive technology
- Email correspondence where companies admit they cannot distinguish legitimate assistive tech
- Legal precedents: NFB v. Target, Van Buren v. US, hiQ Labs v. LinkedIn
- Comparison showing same companies allow similar tools in Europe

## EXHIBIT B - OS LEVEL BLOCKING – page 55
- Systematic "double-barrier" discrimination by OS companies
- iOS App Store guidelines systematically reject accessibility automation
- Android Accessibility Service restrictions and Play Protect blocking
- Windows SmartScreen and UAC barriers preventing assistive tools
- Samsung Knox Security blocking system-level accessibility access
- Amazon Alexa/Echo ecosystem lock-in and Fire OS restrictions
- Enterprise vs. disability discrimination - same tech available to business
[CRITICAL] Proves systematic "double-barrier" discrimination by OS companies

## EXHIBIT C - INTERNATIONAL STANDARDS – page 61
- "SMOKING GUN": European Accessibility Act requires compatibility by June 2025
- Same companies preparing compliance in EU while blocking in US
- Digital Markets Act mandates interoperability for "gatekeepers"
- Proves blocking is choice, not technical necessity
[CRITICAL] Proves intentional discrimination - Essential for willfulness finding

## EXHIBIT D - ECONOMIC IMPACT – page 69
- 3,000+ annual deaths from distracted driving (NHTSA verified data)
- 70 million Americans with disabilities affected
- Government waste from inaccessible systems (GAO reports)
- Veterans suicide rates: 17-22 daily (VA data)
[SUPPORTING] Demonstrates massive scale of harm with verified data only

## EXHIBIT E - RESEARCH VALIDATION – page 78
- Microsoft's own research contradicts their blocking practices
- OpenAI published papers validate orchestration approach
- Google's research supports multi-model consensus systems
- Anthropic's safety principles align with PolyHelper.AI
- Academic validation from accessibility research
[POWERFUL] Defendants' own research proves our case

## EXHIBIT F - ORGANIZATIONS REPRESENTING AFFECTED COMMUNITIES – page 89
- 86 organizations serving communities affected by AI accessibility barriers
- Federal agencies: DOJ Civil Rights Division, NTSB, FTC, HHS Office for Civil Rights
- Congressional: Senator Tammy Duckworth, House Judiciary Committee
- Veterans: DAV (1M veterans), VFW, VA Secretary
- Disability rights: ACLU Disability Rights, DREDF, NFB
- Academic institutions and technology standards organizations
[STRATEGIC] Systematic advocacy contact list

## EXHIBIT G - NATIONAL FEDERATION OF THE BLIND COORDINATION – page 96
- Official correspondence with NFB New York State President
- Escalation to national NFB leadership for in-depth investigation

# APPENDIX 1. MEDICAL REPORT AND EVIDENCE OF HARM

On November 6, 2023, the Plaintiff's son, Dmytro Chernets, was hospitalized at St. Joseph's University Medical Center in Paterson, New Jersey, following a severe pedestrian motor vehicle accident in Ridgewood, NJ.

According to witness statements and police reports, the driver, distracted by a smartphone, struck Dmytro while he was crossing the street at a pedestrian crosswalk and only began braking after the collision had already occurred.

The official medical report (18 pages, MRN 2310124) lists the following diagnoses: epidural hematoma (intracranial bleeding), open fracture of the right proximal humerus, and right scapula fracture. These injuries required emergency hospitalization, neurosurgical observation, and an extended recovery period, resulting in significant physical, emotional, and financial hardship for the family.

The Plaintiff personally coordinated the medical care, post-hospital rehabilitation, and financial support for his son during his recovery period. Dmytro Chernets currently has metal implants in his right arm, which significantly limit mobility and his ability to perform his professional duties as a designer. Due to these injuries, he can work for no more than one hour while sitting, after which he must continue his work lying down and using voice-controlled computer interfaces.

This incident demonstrates the Plaintiff's direct personal and professional connection to the development of assistive and safety technologies, which subsequently led to the creation of the PolyHelper.AI project, a platform designed, first, to prevent driver distraction and protect pedestrians, and second, to assist individuals with disabilities in performing computer-based work through adaptive and voice-enabled systems.

## ADDITIONAL MEDICAL DOCUMENTATION AVAILABLE:

The attached medical report represents initial emergency treatment documentation from St. Joseph's University Medical Center. This constitutes only the first week of treatment from an extensive medical record spanning over two years.

Additional comprehensive medical documentation available upon Court request includes:
- Complete 18-page emergency treatment report (MRN 2310124)
- Surgical intervention reports and operative notes
- Post-surgical rehabilitation and physical therapy records
- Radiological imaging showing metal implant placement

Dmytro Chernets has been receiving continuous medical care for approximately two years following the October 30, 2023 accident. The ongoing treatment requirements and permanent disability resulting from the distracted driving incident directly motivate the Plaintiff's development of driver safety and assistive technology solutions.

3



## St. Joseph's Health

**St. Joseph's University Medical Center**
**703 Main Street**
**Paterson, NJ 07503-2621**
**(973)754-2000**
**Fax: 9737543695**

**Name:** CHERNETS, DMYTRO
**Phone:**
**Address:** 455 LINWOOD AVE RIDGEWOOD NJ 07450
**Date of Birth:** 10/21/1996
**Current Date:** 11/06/2023 15:06:02   **MRN:** 2310124   **FIN:** 660003473139   **CMRN:** 100511267

**Primary Care Provider**
**Name:**
**Phone:**
**Immunizations Provided: Immunizations**
tetanus/diphth/pertuss (Tdap) adult/adol (Not Given)

**Discharge Diagnosis:** Epidural hematoma; Open fracture of right proximal humerus; Pedestrian injured in traffic accident involving motor vehicle; Right scapula fracture
**Discharged To:**
<u>Comment</u>

**Discharge Orders**

**Future Laboratory Orders, if any, will display below**

**Future Radiology Orders, if any, will display below**

11 06 2023 15 06 23

1 of 18

Name CHERNETS DMYTRO
MRN 2310124

4

# APPENDIX 2. BLOCKING CRITICAL ACCESS

While the Plaintiff's current V4 device has been unlawfully restricted and obstructed by the Defendants' AI providers and operating systems, the Plaintiff and his team are in the process of finalizing and preparing for release the next-generation V5 version of the system.

The continuation of such blocking or interference will prevent individuals with disabilities, military veterans, government employees, first responders, and other critical user groups from obtaining or utilizing the following essential accessibility and safety functions of the Plaintiff's forthcoming device:

TABLE OF CONTENTS:

Part I: Functions Vital to Public Safety, Accessibility, and National Security

1. For People with Disabilities
2. For Emergency Services
3. For Driver Safety
4. For Veterans
5. For Elderly Populations
6. For Government Workers and Economy
7. For National Security and Defense

Part II: AI Capabilities, Value, and Implementation Readiness

1. Accessible AI orchestration
2. Core technology innovations
3. Competitive advantages over existing systems
4. Key technical problems being solved
5. System architecture overview
6. Technical Architecture Diagrams
7. V5 advanced features in development
8. Value proposition

6

# PART I: FUNCTIONS VITAL TO PUBLIC SAFETY, ACCESSIBILITY, AND NATIONAL SECURITY

## IMPORTANT TECHNOLOGIES

### 1. FOR PEOPLE WITH DISABILITIES:

1.1. Dynamic context-aware task distribution: automatically partitions large inputs and distributes them across multiple AI models in parallel, reducing latency and ensuring accessibility.

1.2. Multi-modal sensory orchestration: integrates text, audio, and images into a unified output, ensuring accessibility across different sensory limitations.

1.3. Persistent context orchestration: Maintains history across sessions and models, removing the need to repeat inputs.

1.4. Multi-AI consensus validates response clarity and accuracy before delivery, ensuring cognitively impaired users receive reliable, cross-verified guidance during high-stress moments.

1.5. Cross-platform accessibility orchestration delivers unified screen-reader/ARIA support across multiple AI services, eliminating "double payment" barriers when APIs are unavailable.

1.6. Cross-app voice resumption allows users to say "Continue" and resume exactly where they left off across different AI services and applications, without manual switching.

1.7. Multi-AI adaptive consensus prioritizes accessibility preferences, ensuring that blind or neurodiverse users receive validated outputs aligned with their specific needs without manual adjustment.

1.8. Cross-model quality consensus validates non-text content (images, audio, video) ensuring accessibility for blind and hearing-impaired users, with adaptive learning from consensus feedback across multiple AI systems.

1.9. Multi-AI voice-to-code orchestration enables developers to generate and edit code across multiple AI services simultaneously, with consensus validation ensuring accuracy for accessibility-critical applications.

1.10. Cross-platform multi-modal orchestration delivers image description to natural speech for blind users, rich visualizations of audio for deaf users, and cognitive-level simplification for neurodiverse users through parallel model fusion and consensus validation.

1.13. The system introduces AST-based semantic voice control, enabling blind, motor-impaired, and cognitively impaired developers to perform complex refactoring, navigation, and debugging

7

entirely through natural language. This eliminates reliance on brittle text-level commands, providing true accessibility parity in software development.

1.14.  The AI Capability Injection Layer transforms any legacy or inaccessible application into an AI-augmented, voice-controllable, screen-readable, and simplified interface, enabling blind, paralyzed, and cognitively impaired users to access software previously unusable to them.

1.15.  Unified cross-app memory eliminates the need for repeated data entry across applications, enabling blind, cognitively impaired, and physically disabled users to maintain continuity of tasks without re-entering names, preferences, or context.

1.16.  Bidirectional control via accessibility APIs (Android Accessibility Service, iOS UI testing hooks, Windows UIA) lets users operate any app hands-free while the Context Bridge preserves state across apps, eliminating repetitive input.

2.  FOR EMERGENCY SERVICES:

2.1. Dynamic context-aware task distribution: enables rapid orchestration of transcription, translation, and analysis for emergency scenarios where seconds save lives.

2.2. Multi-modal sensory orchestration: fuses video, audio, and sensor data into a real-time dashboard for faster situational awareness.

2.3. Keeps full context available when operators switch devices during urgent missions.

2.4. Multi-AI consensus adapts emergency responses based on danger and urgency validation across models, ensuring reliable alerts and coordinated emergency response protocols.

2.5. The system detects emergencies (falls, collisions, distress signals) and activates protocols: immediate alerts, automatic evidence recording, geolocation sharing, and direct 911 calls with medical data.

2.6. Secure orchestration prevents malicious interference with healthcare and 911 systems by enforcing digital signatures, encrypted clipboard management, and sandboxed automation during life-critical operations.

2.7. Advanced multi-AI consensus and real-time orchestration provide sub-100ms, high-confidence responses across web interfaces, reducing life-critical errors during 911 and healthcare operations.

2.8. Auto-pause/resume with sensor fusion (sirens, braking, steering events) maintains operator focus and prevents UI manipulation during critical response, while resuming guidance hands-free once conditions stabilize.

8

2.9. The multi-level consensus engine provides fault-tolerant, context-aware validation during medical or 911 use cases, reducing hallucinations and preserving critical signals where seconds save lives.

2.10. Functions include a Central Arbitration Module (ACM) that guarantees the most accurate and conflict-free AI response in critical 911 and healthcare scenarios, and Streaming Validation, which validates outputs during generation and immediately halts low-quality or unsafe results—saving seconds that are vital for first responders.

2.11. Functions include Medical Information Orchestration, which ensures health information consensus and secure patient data handling. This architecture enables faster and safer decisions in 911 calls, hospital ER, and telemedicine emergencies.

2.12. Plaintiff's system performs deadline-aware, sliding-window orchestration of live audio/video streams (e.g., real-time translation and scene analysis) with partial-consensus fallbacks under strict latency SLAs, enabling reliable hands-free support for 911 and first-responder operations.

2.13. The system deploys horizontal orchestration (parallel speech recognition, translation, and event classification) with shared context and priority routing, delivering unified 911 response outputs in ≤10 seconds without manual switching.

2.14. The system logs real-time decision chains (model → score → selection) and instantly generates concise, explainable summaries for dispatchers, ensuring transparency without delaying critical response.

2.15. The system bridges AI and critical applications (maps, communication, scheduling) into a seamless workflow, allowing 911 dispatchers and first responders to coordinate tasks without losing context, reducing response times in emergencies.

2.16. Cross-platform emergency orchestration coordinates multiple AI services and device capabilities simultaneously to call 911, stream video/audio, transmit medical history, and alert family, reducing emergency response coordination time.

2.17. Advanced quality validation for visual and audio content validates life-critical outputs in real time, reducing misinterpretation during 911, medical imaging, and incident response.

2.18. The Universal API Gateway and circuit-breaker/auto-retry stack maintain sub-second failover between services, ensuring call-center, translation, and dispatch functions continue under load or partial outages.

2.19. Intelligent resource management prevents app crashes and battery depletion during active incidents, maintaining recording, location, and translation services simultaneously.

2.20. The BidirectionalOrchestration algorithm validates permissions, executes with monitored fallbacks, and maintains audit trails—supporting reliable 911/dispatch chains under failure.

9

3. FOR DRIVER SAFETY:

3.1. Multi-modal sensory orchestration: combines road images, spoken queries, and sensor data to deliver non-distracting guidance while driving.

3.2. Synchronizes navigation and assistance across car systems, phones, and headsets.

3.3. Adaptive response ensures drivers receive the right level of warning — urgent, simplified, and context-aware — reducing accidents caused by delayed or unclear alerts.

3.4. Concise, context-aware voice warnings prevent distracted driving, e.g., "STOP! Car coming!" with haptic and audio reinforcement in critical scenarios.

3.5. Security-hardened architecture blocks unauthorized UI automation that could disable driver assistance features, ensuring safe media resumption and hands-free orchestration while preventing data leaks.

3.6. Context-aware, browser-level multimodal integration and proactive orchestration keep assistance continuous across interfaces, minimizing distraction while maintaining reliable, consensus-validated guidance.

3.7. The system captures pause context (app, media object, precise timestamp) and restores playback by voice in <1–2 seconds, replacing 12–15 seconds of hazardous visual navigation and reducing distraction-related crash risk.

3.8. Consensus adapts to driving context, filtering outputs in real time to prevent distracting or unsafe AI instructions, and maintaining life-critical reliability during vehicle operation.

3.9. Predictive preloading ensures navigation, communication, and media apps are instantly available during driving workflows, reducing distraction and minimizing accident risk.

3.10. Context transfer between navigation, communication, and media services minimizes manual switching while driving, reducing eyes-off-road time.


4. FOR VETERANS:

4.1. Adaptive continuity supports PTSD therapy by adjusting tone, urgency, and detail level, ensuring veterans receive consistent, non-traumatizing responses.

4.2. Military-grade security safeguards PTSD and medical data with hardware-backed encryption, biometric access, and zero-trust controls, preventing exposure of sensitive health and therapy records.

4.3. Persistent Context Orchestration ("digital brain") preserves longitudinal therapy context and adapts responses, supporting PTSD treatment continuity across models, devices, and web platforms.

4.4. Hands-free, position-accurate resumption supports therapeutic audio and training content in vehicles without cognitive overload or manual device handling, aiding continuity for PTSD and rehab routines.

4.5. Adaptive weighting aligns therapeutic AI responses with personal histories, preserving continuity for PTSD treatment and reducing the risk of harmful or misleading outputs.

4.6. Accessibility-First orchestration also benefits veterans with PTSD or physical disabilities, providing fatigue-aware, zero-click development and cognitive assistance modes that reduce stress and suicide risk in professional retraining programs.

5. FOR ELDERLY POPULATIONS:

5.1. Multi-AI consensus validates instruction clarity and provides coordinated alert systems across platforms, enabling comprehensive support for elderly users through cross-platform integration.

5.2. Clipboard and UI protection frameworks prevent fraud and unauthorized data capture, giving elderly users transparency and confidence when relying on orchestration for healthcare and finance.

5.3. Accessibility-first design with simplified interactions and proactive orchestration reduces cognitive burden and supports safer day-to-day tasks across common web services.

5.4. Universal "Resume/Continue" commands with no app or file specification reduce cognitive burden and prevent risky screen interactions, supporting safer driving for older users.

5.5. Consensus prioritizes clarity, safety, and personalization for older users, filtering complex or confusing responses and supporting trusted, reliable guidance.

5.6. Functions include multi-metric quality consensus mechanisms to guarantee clarity and correctness of medical or daily-life instructions, and dynamic learning from consensus feedback, allowing the system to gradually adapt to the speech patterns and preferences of elderly users.

5.7. Can be referenced indirectly: simplified natural-language coding modes reduce cognitive load and enable elderly populations (with dementia or cognitive decline) to interact with AI coding tools in plain speech rather than technical syntax.

5.8. Plaintiff's system auto-simplifies complex content into step-by-step, plain-language narratives matched to user profiles, improving comprehension and reducing cognitive load for seniors while preserving medical, legal, and safety context.

6. FOR GOVERNMENT WORKERS AND ECONOMY:

6.1. Context-aware orchestration enables continuity in legal, enterprise, and healthcare workflows, reducing redundancy and saving millions in lost productivity.

6.2. Enterprise-grade security with comprehensive audit trails, anomaly detection, and data loss prevention reduces compliance risks and protects confidential workflows in government and legal sectors.

6.3. Unified web-based orchestration eliminates context fragmentation, cuts duplicate effort, and optimizes model selection and cost, improving efficiency for legal, enterprise, and public-sector workflows.

6.4. Platform-agnostic, standards-compliant (Media Session API, CarPlay/Android Auto) voice resumption reduces distraction-related incidents in public fleets, lowering liability, healthcare, and downtime costs.

6.5. Context-aware consensus ensures regulatory compliance, optimizes task routing for legal and economic applications, and reduces inefficiencies across federal and commercial systems.

6.6. Functions include Professional Validation Chains, which provide structured multi-step verification for legal, medical, and financial documents, and a Comprehensive Regulatory Compliance Framework covering HIPAA, GDPR, SOC-2, PCI-DSS, and other mandatory standards, ensuring lawful use of AI across government and enterprise workflows.

6.7. Functions include Legal Domain Orchestration and Financial Domain Orchestration, which provide multi-jurisdiction validation, regulatory compliance checking, contract analysis, fraud detection, and SEC/financial regulatory alignment. This reduces inefficiencies for legal professionals, financial officers, and government workers who require strict compliance and audit trails.

6.8. The Proof-of-Code-Quality (PoCQ) consensus ensures secure, reliable, and regulation-compliant code validation. This directly reduces inefficiencies and prevents errors in software used by federal agencies, legal systems, and financial institutions.

6.9. Plaintiff's system applies a universal quality-scoring framework with modality-specific metrics (text, image, video, audio, 3D, code) plus consensus consistency/diversity checks, and an optimizer that selects the minimal model set to meet target quality at lowest compute cost for public-sector workloads.

6.10. Plaintiff's system enforces SLA-bound streaming consensus for public broadcasts and hearings, emitting confidence-scored results and automatic SLA-violation logs to maintain continuity under degraded network or model conditions.

6.11. Plaintiff's system implements human-in-the-loop creative enhancement cycles (generate → filter → user select → refine), accelerating compliant content production for public

12

communications and training materials while preserving measurable preference learning and auditability.

6.12. Plaintiff's system orchestrates multi-model professional validation chains (medical, legal, financial) with parallel analysis, weighted consensus, audit logs, and automatic human-review routing for high-risk outputs—reducing costly errors and rework across public agencies and regulated industries.

6.13. The system applies orchestration typology (horizontal/vertical/context-adaptive) with shared context memory and automated task redistribution across agents, reducing document processing times and accelerating citizen request handling.

6.14. The system maintains a complete orchestration audit trail: which agents were applied, confidence levels, alternatives considered, and rationale for selection; it produces explainable reports for compliance and oversight.

6.15. By enabling developers with disabilities to contribute effectively through AST-level voice orchestration, the system unlocks an underserved workforce segment, directly reducing inefficiencies in federal IT projects, government software maintenance, and public-sector digital transformation.

6.16. The Universal AI-App Orchestration Layer eliminates context switching between dozens of applications and AI services by treating all functions as interchangeable and outcome-based. This reduces bureaucratic delays, accelerates document workflows, and improves efficiency in government operations.

6.17. By retrofitting AI into decades-old enterprise and government software without modification, the system saves billions in modernization costs and directly reduces inefficiencies in public-sector IT and economic workflows.

6.18. Cross-platform workflow orchestration preloads entire sequences (Email → Calendar → Maps → Documents) across multiple AI services, dramatically reducing context switching and improving efficiency in government, legal, and enterprise environments.

6.19. By fusing fragmented data across hundreds of siloed applications, the system creates a coherent memory graph that accelerates workflows, reduces redundancy, and optimizes productivity across public-sector and enterprise operations.

6.20. An oracle database of model performance and error patterns routes tasks to the most reliable engines, cutting rework and accelerating document, media, and analytics workflows across agencies.

6.21. Multi-platform protocol translation (REST/GraphQL/WebSocket/gRPC) and encrypted context sync enable seamless interoperability among legacy systems and multiple AI services without costly rewrites.

13

6.22. Unlike prior art limited to single-model distribution or platform-specific agents, this system provides a universal, bidirectional orchestration layer where traditional applications and independent AI services act as equal peers—unlocking cross-vendor workflows in public-sector stacks.

6.23. The Universal Protocol Layer achieves comprehensive service compatibility, eliminating manual swivel-chair tasks and significantly decreasing app-switching time across multiple AI platforms.

6.24. The TranslateProtocol algorithm normalizes heterogeneous endpoints (REST/GraphQL/WebSocket/gRPC) into a single intermediate representation, enabling seamless, low-latency interagency workflows.

## 7. FOR NATIONAL SECURITY AND DEFENSE

7.1. Preserves operational and tactical context across devices for soldiers and responders.

7.2. Adaptive response maintains mission continuity for defense, intelligence, and training scenarios, supporting operational awareness and compliance in high-risk environments.

7.3. The orchestrator implements defense-in-depth security, including hardware-level encryption, multi-factor authentication, and secure AI model isolation — exceeding military-grade standards for defense operations and classified data handling.

7.4. A distributed consensus network with model-reputation scoring and advanced fault tolerance strengthens reliability and security of AI outputs across mission-critical web environments.

7.5. Context-aware, hands-free media control integrates with vehicle sensors and ADAS to preserve situational awareness in tactical driving, enabling reliable resumption across mission systems without manual input.

7.6. Enhanced adaptive consensus provides mathematically provable reliability and resilience against adversarial AI attacks, ensuring safe deployment in defense and intelligence operations.

7.7. Functions include the Central Arbitration Module for resolving conflicts between multiple AI outputs in intelligence analysis, Professional Validation Chains for high-stakes decision-making in defense contracts and security operations, and the Regulatory Compliance Framework that demonstrates adherence to NATO, DoD, and EU standards.

7.8. Functions include cross-domain orchestration with regulatory and compliance validation, ensuring that legal, medical, and financial intelligence is processed under strict regulatory standards. This is directly relevant for defense and national security operations that depend on accurate, compliant multi-domain analysis.

7.9. Advanced validation provides secure consensus pipelines for mission-critical code, detecting common vulnerabilities and enforcing security compliance standards. This is directly relevant to defense contractors, law enforcement, and national security agencies relying on AI-assisted code generation.

7.10. Plaintiff's system couples modality-aware quality metrics with load-balanced model selection and tamper-evident logs, providing reproducible, mission-grade outputs and performance predictability for defense and law-enforcement use.

7.11. Plaintiff's system provides mission-critical validation chains that fuse outputs from heterogeneous AI models, apply risk-weighted consensus, and enforce human-in-the-loop confirmation for safety-critical decisions, improving reliability for defense and law-enforcement workflows.

7.12. The system coordinates a 'swarm' of specialized agents (translation, computer vision, analytics) with consensus and degraded partial-consensus modes under time pressure, increasing reliability of situational awareness in defense operations.

7.13. The system constructs decision graphs with human overrides and immutable logs, ensuring traceability and reproducibility in missions and intelligence investigations.

7.14. The architecture integrates AI models and traditional defense systems through a persistent context bridge, ensuring secure, tamper-proof orchestration across intelligence, logistics, and communication platforms while maintaining compliance with security protocols.

7.15. In security and defense contexts, the override mode unifies intelligence, communication, and logistical resources instantly, ensuring mission continuity and rapid mobilization under attack, natural disaster, or hostile events.

7.16. Advanced content validation hardens intelligence pipelines against spoofing and deepfakes, improving target identification confidence.

7.17. Intelligent resource management (battery/CPU/memory-aware with predictive algorithms) guarantees mission-critical apps and AI pipelines maintain priority during operations and degraded networks.

7.18. By unifying protocol translation, persistent context, and AI↔app autonomy, the system enables heterogeneous, multi-domain command workflows that prior agent-only or app-only solutions cannot coordinate.

7.19. The ArbitrateResourceRequests algorithm predicts demand and preempts resources for critical pipelines, ensuring priority telemetry, comms, and analytics persist during high-risk operations.

## PART II: AI CAPABILITIES, VALUE, AND IMPLEMENTATION READINESS

Upon the Court's request, all patent documents with application numbers and filing dates will be provided.

The Plaintiff's next-generation V5 system represents advanced assistive technology that Defendants' blocking prevents disabled users from accessing.

## 1. ACCESSIBLE AI ORCHESTRATION

An assistive technology system enabling persons with disabilities to orchestrate multiple artificial intelligence services through voice control and accessibility interfaces. The system addresses the technical problem that disabled users who subscribe to multiple AI services (ChatGPT, Claude, Gemini) cannot efficiently switch between them due to visual/motor limitations.

The invention provides tri-modal operation: (1) API integration where available, (2) UI automation for services without APIs, (3) accessibility framework integration for system-level control. A lightweight orchestration core delegates consensus computation to external models, enabling edge deployment.

Working prototype demonstrates voice-controlled operation for disabled users, multi-AI consensus without manual switching, WCAG accessibility framework compliance, and legitimate assistive technology approach.

## 2. CORE TECHNOLOGY INNOVATIONS

1. TRI-MODAL UNIVERSAL INTERFACE ARCHITECTURE
- API integration (when available)
- UI automation via accessibility frameworks (when APIs absent)
- System-level control (for platform services)

2. DELEGATED CONSENSUS ARCHITECTURE
- Lightweight orchestrator delegates AI processing to user's existing models
- Enables deployment on resource-constrained devices
- Byzantine fault tolerance ensuring reliability

3. DRIVER SAFETY SUBSYSTEM

16

- Calculates distraction value using speed, gaze deviation, grip parameters
- Automatic pausing of AI interactions during dangerous moments
- Voice-controlled resumption to reduce accident risk

4. ACCESSIBILITY-FIRST DESIGN
- WCAG AAA compliance framework
- Voice-only operation for motor impairments
- Screen reader compatibility for visual impairments
- Cognitive load reduction for cognitive disabilities

5. PERSISTENT CONTEXT ORCHESTRATION (PCO)
- Maintains conversation history across sessions and models
- Eliminates need for disabled users to repeat inputs
- Cross-app memory fusion and unified context

## 3. COMPETITIVE ADVANTAGES OVER EXISTING SYSTEMS

| Feature | Prior Art | This Invention |
|---|---|---|
| API dependency | Required | Optional (tri-modal) |
| Edge deployment | No | Yes (delegated) |
| Disability adaptations | Limited | Comprehensive |
| Persistent context | No | Yes (PCO) |
| Voice-only operation | Partial | Complete |
| Working implementation | N/A | Prototype tested |
| WCAG AAA compliance | Limited | Comprehensive |
| Consensus validation | Simple voting | Adaptive algorithms |
| Safety-critical modes | No | Driver safety / emergency |

## 4. KEY TECHNICAL PROBLEMS BEING SOLVED

PROBLEM 1: Context Amnesia
- CURRENT: Disabled users must re-explain needs to each AI session
- SOLUTION: Persistent Context Orchestration maintains full history

PROBLEM 2: Manual Switching Barriers
- CURRENT: Visual/motor limitations prevent app switching
- SOLUTION: Voice-controlled multi-AI consensus in single interface

PROBLEM 3: Driver Safety Crisis
- CURRENT: Manual AI switching causes distracted driving fatalities
- SOLUTION: Hands-free orchestration with automatic safety pausing

PROBLEM 4: Enterprise vs Disability Discrimination
- CURRENT: Businesses get orchestration tools, disabled users blocked
- SOLUTION: Legitimate assistive technology framework

## 5. SYSTEM ARCHITECTURE OVERVIEW

CORE COMPONENTS:
1. Universal Orchestration Engine (lightweight, edge-deployable)
2. Tri-Modal Interface Layer (API/UI/Accessibility)
3. Consensus Validation Module (Byzantine fault tolerant)
4. Safety Monitoring Subsystem (driver/emergency protection)
5. Persistent Context Bridge (cross-session memory)

DEPLOYMENT MODEL:
- Runs on user's device (privacy-preserving)
- Works with user's existing AI subscriptions
- No server dependency for core functions
- Legitimate assistive technology classification

# 6. TECHNICAL ARCHITECTURE DIAGRAMS

## 1. FLOWCHART OF TASK DISTRIBUTION



SIMPLE EXPLANATION:
Imagine a police officer, firefighter, military commander, or government official who needs to make an urgent decision. They have limited time but dozens of photos to analyze and multiple documents to review. Our orchestrator acts like the perfect assistant - it instantly takes all those images and texts, distributes them among every AI available on the device, and they work in parallel to process everything simultaneously. Some documents might be in foreign languages, so our assistant splits the text into parts, sends pieces to different translation AIs, then reassembles everything into a complete, ready-to-use translation. Within seconds, instead of spending 30 minutes manually going through everything, the official gets a comprehensive analysis that could save lives or prevent disasters. That's the power of intelligent task distribution.

## 2. FUSION ARCHITECTURE



SIMPLE EXPLANATION:

Think of this like having eyes, ears, and touch all working together to understand your world. Your camera sees what you're looking at, your microphone hears what you're saying, and your sensors (like on your smartwatch) know if your heart is racing or if you're moving. Instead of each sense working alone, our system combines all this information to truly understand your situation. For example, if you say "I'm worried about this plant" while your camera sees a flower and your watch shows your heart rate is high, the system puts it all together to give you the most helpful response about whether the plant might be dangerous.

## 3. SYNCHRONIZATION METHOD BETWEEN DEVICES AND SERVICE CENTER



**SIMPLE EXPLANATION:**
This works like your personal digital memory that follows you everywhere. Imagine you start a conversation with your assistant on your phone in the morning, continue it in your car during your commute, then pick it up again on your computer at work. The system remembers everything across all your devices, so you never have to repeat yourself or lose track of important conversations. It's like having a friend who has perfect memory and can seamlessly continue any conversation no matter which device you're using. All your information stays private and secure while being available wherever you need it.

## 4. FLOW OF ADAPTIVE RESPONSE GENERATION



**SIMPLE EXPLANATION:**

This is like having a smart assistant that reads the room and adapts to your situation. Think of it as an emotionally intelligent friend who notices when you're stressed, tired, or in a hurry, and adjusts how they talk to you accordingly. If you're driving and ask a question, it gives you a short, clear answer and might even take safety actions. If you're relaxed and learning something new, it provides detailed explanations. If you're having an emergency, it immediately switches to urgent, actionable guidance. The system constantly monitors your environment and emotional state to give you exactly the right type of response for your current needs.

5. DEFENSE-IN-DEPTH ARCHITECTURE

| USER LAYER | → Biometric auth, explicit consent |
|---|---|
| APPLICATION LAYER | → Sandboxing, digital signatures |
| OS LAYER | → Process isolation, least privilege |
| HARDWARE LAYER | → TPM / Secure Enclave encryption |

SIMPLE EXPLANATION:
This is like having multiple locks on your front door, where each lock protects against different types of threats. Just as you might have a deadbolt, a chain lock, and a security camera, our system has multiple layers of protection. At the top, you have to prove it's really you (like using your fingerprint). Then the application checks that everything is properly signed and authorized. Your computer's operating system makes sure programs can't interfere with each other, and finally, the hardware itself has special chips that keep your most sensitive information locked away. If someone gets past one layer, they still have to deal with all the others.

6. ARCHITECTURE OVERVIEW



Persistent Context
("Digital Brain")

Distributed Security
("Herd Immunity")

Multi-Modal Fusion
(Browser Integration)

Accessibility-First
(ADA / WCAG)

Consensus
Validation

8. CONSENSUS PROCESS FLOW



SIMPLE EXPLANATION:
This is like asking three doctors for their opinion and then having a smart system figure out the best advice. When you ask a question, it goes to multiple AI assistants (like asking ChatGPT, Claude, and Gemini all at once). Then our system works through three levels of checking: First, it makes sure enough of them agree on the basic answer. Second, it weighs each response based on how reliable each AI has been before and how confident they seem. Third, it makes sure no important warnings or safety concerns get ignored, even if only one AI mentioned them. The final answer combines the best parts of all their responses, giving you something more reliable than any single AI could provide.

## 9. PROOF-OF-CODE-QUALITY VALIDATION PIPELINE



**SIMPLE EXPLANATION:**

Think of this as having a team of expert programmers working together to create the perfect code. When you need a program written, multiple AI systems each create their own version. Then our quality control system acts like a tough but fair manager, checking each version for errors, security problems, and performance issues. It's like having your code reviewed by experts in syntax, security, and optimization all at once. The system even adapts the standards based on what you're building - medical software gets extra security checks, while prototype code focuses more on speed. The final result is code that's been thoroughly tested and certified to work safely and efficiently.

26

10. DYNAMIC TASK DISTRIBUTION PIPELINE

```
┌─────────────────────────────────────────────┐
│          Input: Large Document / Query        │
└─────────────────────────────────────────────┘
                        │
                        ▼
┌─────────────────────────────────────────────┐
│        Multi-Tenant Workload Balancer         │
│    - SLA & priority enforcement               │
│    - Concurrent user optimization             │
│    - Dynamic workload distribution            │
└─────────────────────────────────────────────┘
                        │
                        ▼
┌─────────────────────────────────────────────┐
│     Context Window Evaluation Module          │
│    - Evaluates model capacities (4K-1M)       │
│    - Checks model load & availability         │
│    - Assesses specialization & speed          │
└─────────────────────────────────────────────┘
                        │
                        ▼
┌─────────────────────────────────────────────┐
│     Dynamic Task Distribution Engine          │
│    - Calculates total input size              │
│    - Selects chunking strategy:               │
│        - Fixed-size splitting                  │
│        - Semantic chunking                     │
│        - Relation-based hierarchies            │
└─────────────────────────────────────────────┘
                        │
                        ▼
┌─────────────────────────────────────────────┐
│          Energy-Aware Scheduler               │
│    - Battery capacity optimization            │
│    - Thermal constraints management           │
│    - Resource longevity preservation          │
└─────────────────────────────────────────────┘
                        │
                        ▼
```

```
┌─────────────────────────────────────────────┐
│           Parallel Model Assignment          │
│      - Assigns segments to models by:        │
│          - Capacity C(i)                     │
│          - Specialization S(i)               │
│          - Availability A(i)                 │
│          - Load L(i)                         │
│      - Uses: D(i) = C×S×A/L                   │
└─────────────────────────────────────────────┘
                      │
                      ▼
┌─────────────────────────────────────────────┐
│              Parallel Execution              │
│      - Multiple models process segments      │
│      - Emergency: translation models         │
│      - Documents: specialized analysis       │
│      - Images: multi-angle processing        │
└─────────────────────────────────────────────┘
                      │
                      ▼
┌─────────────────────────────────────────────┐
│         Compliance Registry Logging          │
│      - Immutable audit trail creation        │
│      - Regulatory traceability               │
│      - Mission-critical readiness            │
└─────────────────────────────────────────────┘
                      │
                      ▼
┌─────────────────────────────────────────────┐
│              Result Aggregation              │
│      - Voting mechanisms for consensus       │
│      - Weighted averaging by confidence      │
│      - Cross-model validation                │
└─────────────────────────────────────────────┘
                      │
                      ▼
┌─────────────────────────────────────────────┐
│                Final Output                  │
└─────────────────────────────────────────────┘
```

SIMPLE EXPLANATION:
This is like having a smart dispatch center that knows how to handle emergencies efficiently. When you have a huge task (like analyzing a massive document), the system first checks how urgent it is and what resources are available. It's like a hospital emergency room that triages patients - life-threatening cases get immediate attention with all available doctors, while routine checkups can wait for thorough care. The system divides big jobs among multiple AI assistants based on what each one is good at, monitors energy usage so your device doesn't overheat, and keeps detailed records for accountability. Everything gets coordinated to give you the fastest, most accurate result possible.

## 11. REAL-TIME ADAPTIVE STREAM PROCESSING WITH QUALITY ASSURANCE



SIMPLE EXPLANATION:
This is like having a smart timer that knows when to give you quick answers versus detailed ones. Imagine you're watching a live sports game and ask a question. If there's plenty of time (more than 2 seconds), the system gives you a full, detailed answer from multiple sources. If time is tight (between 0.5-2 seconds), it gives you a good answer but maybe from fewer sources to be faster. And if it's an emergency (less than 0.5 seconds), it immediately gives you the best quick answer from the most reliable source. No matter what, you always get an appropriate answer within your time constraints - detailed when possible, quick when necessary.

## 12. BLOCK ARCHITECTURE WITH CLEAR HIERARCHY



SIMPLE EXPLANATION:
This is like the blueprint of a modern smart building with perfect accessibility. At the top, you have all your devices (phone, car, computer, smartwatch) that can talk to the system through voice, touch, or any way that works for you. The middle layer is like a universal translator that understands every type of input and adapts to your specific needs. At the heart is the "brain" of the system - the orchestrator that manages tasks, remembers everything, and makes smart decisions. At the bottom are different AI assistants (some good at long documents, others at quick answers, some specialized for specific tasks) plus sensors that see and hear the world around you. Everything works together seamlessly to give you exactly what you need, when you need it, in the way that works best for you.

## 7. POLI HELPER V5 ADVANCED FEATURES IN DEVELOPMENT

The full V5 system includes 49 advanced capabilities currently blocked by Defendants:

TOP 10 BREAKTHROUGH FEATURES:
1. Emergency Override System (8-second 911 response)
2. Multi-Modal Sensory Orchestration (vision/audio/touch integration)
3. Central Arbitration Module (conflict-free AI consensus)
4. AST-Based Semantic Voice Control (natural language coding)
5. Professional Validation Chains (high-stakes decision support)
6. Federated Learning with Differential Privacy
7. Horizontal Agent Swarm Coordination
8. Real-Time Stream Processing (sub-100ms response)
9. Military-Grade Security Architecture
10. Universal API Gateway with Circuit Breakers

## 8. VALUE PROPOSITION

FOR DEFENDANTS' INTERNAL USE:
- Solves hallucination problems through consensus validation
- Reduces customer support costs via better accessibility
- Provides competitive advantage in accessibility compliance
- Enables new revenue streams from disability market (1.3B users globally)

FOR REGULATORY COMPLIANCE:
- European Accessibility Act compliance (June 2025 deadline)
- ADA Section 508 federal contract requirements
- UN Convention on Rights of Persons with Disabilities alignment

## EXHIBIT A: COMPREHENSIVE EVIDENCE OF SYSTEMATIC BLOCKING

TABLE OF CONTENTS:

Part I: Complete Correspondence with Defendants

  Section 1: Live Test of AI Access Failures
  Section 2: Correspondence with OpenAI (ChatGPT)
  Section 3: Correspondence with Anthropic (Claude)

Part II: BLOCKING ACCESSIBILITY

  Section 1: Methods of Blocking Assistive Technology
  Section 2: Documented Blocking Patterns
  Section 3: Legal Precedents Against Blocking

Part III: Commercial Precedents and UI Automation Necessity

  Section 1: Executive Summary
  Section 2: The "Smoking Gun" - Harpa AI
  Section 3: Other Commercial Successes Doing the "Impossible"

  A. Bardeen - AI Workflow Automation Platform
  B. Browserflow / Axiom - Web Automation Tools
  C. Enterprise Platforms
  D. IFTTT - Integration Platform

Part IV. The Forced UI Automation Necessity

  Section 1: The Critical Distinction
  Section 2: The Forced Choice

Part V. Microsoft's Own Documentation Contradiction

Part VI. Legal Framework Protecting UI Automation

  Section 1: Van Buren v. United States (2021)
  Section 2: hiQ Labs v. LinkedIn (9th Circuit)
  Section 3: Mobley v. Workday (N.D. Cal. 2025)
  Section 4: DOJ Post-Van Buren Guidance

Part VII. Summary and Conclusion

VIII. Conclusion

# PART I: COMPLETE CORRESPONDENCE WITH DEFENDANTS

This exhibit contains complete, unedited correspondence between PolyHelper.AI team and AI companies, demonstrating good faith attempts to resolve accessibility issues before litigation.

## SECTION 1: LIVE TEST OF AI ACCESS FAILURES



## CORS Blocking Test – REAL

This test shows real CORS errors when trying to access AI services programmatically

[ Run Test ]  [ Check Browser Console for Details ]

### Test Results:

■ https://chat.openai.com
BLOCKED by CORS policy
This prevents assistive technology from working
Error: Failed to fetch
Time: 2025-04-28T21:30:52.745Z

■ https://claude.ai
BLOCKED by CORS policy
This prevents assistive technology from working
Error: Failed to fetch
Time: 2025-04-28T21:30:53.210Z

■ https://gemini.google.com
BLOCKED by CORS policy
This prevents assistive technology from working
Error: Failed to fetch
Time: 2025-04-28T21:30:53.529Z

■ https://www.perplexity.ai
BLOCKED by CORS policy
This prevents assistive technology from working
Error: Failed to fetch
Time: 2025-04-28T21:30:53.960Z

■ https://chat.deepseek.com
BLOCKED by CORS policy
This prevents assistive technology from working
Error: Failed to fetch
Time: 2025-04-28T21:30:54.341Z

■ https://copilot.microsoft.com
BLOCKED by CORS policy
This prevents assistive technology from working
Error: Failed to fetch
Time: 2025-04-28T21:30:54.736Z

■ https://x.com
BLOCKED by CORS policy
This prevents assistive technology from working
Error: Failed to fetch
Time: 2025-04-28T21:30:55.113Z

■ https://copilot.microsoft.com
BLOCKED by CORS policy
This prevents assistive technology from working
Error: Failed to fetch
Time: 2025-04-28T21:30:54.739Z

■ https://x.com
BLOCKED by CORS policy
This prevents assistive technology from working
Error: Failed to fetch
Time: 2025-04-28T21:30:55.117Z

■ https://qwen.alibaba.com
BLOCKED by CORS policy
This prevents assistive technology from working
Error: Failed to fetch
Time: 2025-04-28T21:30:55.195Z

■ https://chat.mistral.ai
BLOCKED by CORS policy
This prevents assistive technology from working
Error: Failed to fetch
Time: 2025-04-28T21:30:55.669Z

■ https://www.meta.ai
BLOCKED by CORS policy
This prevents assistive technology from working
Error: Failed to fetch
Time: 2025-04-28T21:30:55.173Z

34

Could we explore how PolyHelper.AI can work within ChatGPT's framework to serve these users?

We're documenting accessibility approaches across the AI industry and would value OpenAI's leadership perspective on this critical issue.

Sincerely,
Vadym, Victoria, and the PolyHelper.AI Project Team, New York
+1 (718) 905-8643
E-mail: info@polyhelper.ai

---

Hi Victoria and Dr. Chernets!

Thank you for your insightful feedback and for focusing on accessibility.

Quick Guide and Options

Addressing Existing Barriers

- Cloudflare Issues: Using the official ChatGPT desktop (Mac/Windows) or mobile app can often bypass browser-based problems. If using the web version, try disabling aggressive privacy/ad-blocking extensions for **chat.openai.com**, allowing cookies and local storage, avoiding incognito mode, and ensuring your system clock and time zone are correct.
- Session Timeouts: The desktop app generally maintains sessions more reliably than the browser. On the web, keep a single tab active, avoid frequent clearing of third-party cookies, and use the "Keep me signed in" feature. For automation, use the API instead of the consumer web app to avoid interactive issues.
- Rate Limiting (for API use): Implement exponential backoff, batch/cache requests, and reduce input/output token lengths. If you are still hitting limits, check your usage tier and limits on your dashboard. Guide:
[https://help.openai.com/en/articles/6891753](https://help.openai.com/en/articles/6891753)

How Assistive Tools Can Integrate Safely

- Use the API instead of automating the ChatGPT web UI when orchestrating multiple models. This avoids the need for human verification and provides reliable authentication, quotas, and traceability.
- Include a safety_identifier in each API call so we can track abuse patterns while protecting user privacy (hash a stable user or session ID). Guide:
[https://help.openai.com/en/articles/5428082](https://help.openai.com/en/articles/5428082)
- Follow safety guidelines when building voice/assistive flows (input filtering, output handling, and clear user acknowledgments for sensitive actions).

Best Practices for Accessible Orchestration

36

- Prefer OAuth or Project API keys; do not pass personal keys.
[https://help.openai.com/en/articles/5008148](https://help.openai.com/en/articles/5008148)
- Minimize prompt length and reuse system prompts; keep user intent concise for faster, more stable responses.
- For verification scenarios, perform lightweight checks (o3-mini/o4-mini/4o-mini) before sending heavier requests, and cache previous results to reduce redundant calls.
- If you need long-running voice workflows, maintain a stable API session/token storage on your application rather than relying on the consumer web session.
- For moderation or policy checks, you can pre-check with our moderation API endpoints (as outlined in our safety docs) before proceeding with your primary model.

Regarding "Recognizing Legitimate Assistive Aids"

- We do not have a public "whitelist" for third-party tools on the consumer ChatGPT web app. For reliable access, use API integration with a safety_identifier and standard authentication processes.

On Plus and the API

- ChatGPT Plus is for the consumer ChatGPT app and may have usage limits. API access is separate, with its own pricing and rate limits. For orchestration tools and accessibility, the API is the recommended path.

Next Steps Questions (So I Can Tailor a Setup Guide)

1. Are your users interacting via the ChatGPT web app, desktop/mobile apps, or your own application using the OpenAI API?
2. What screen reader/browser/OS combinations are most affected, and what specific error messages or rate limitations are you seeing?

If you share this information, I can provide a specific integration schematic (authentication, models, evaluation strategies) and a minimal example request flow tailored to your use case.

---

Hello Victoria and Dr. Chernets,

Thank you for reaching out to OpenAI Support and for sharing both the mission of PolyHelper.AI and the real-world challenges disabled users are facing. We deeply agree that accessibility is essential and aligns directly with OpenAI's commitment to making AI useful and beneficial for everyone. I'd like to address your points with as much clarity as possible.

Cloudflare challenges and screen readers

We recognize that third-party security layers like Cloudflare can sometimes create barriers for users relying on screen readers. We are in ongoing discussions with our providers to ensure that necessary security checks remain compatible with assistive technologies, and feedback like yours helps us prioritize this work.

Session timeouts and rate limits

Timeouts and rate limits are in place to balance responsible resource management and platform safety, but we understand how disruptive these can be for voice-controlled and persistent accessibility workflows. For developers working with the OpenAI API, we recommend reviewing our best practices for handling rate limits to create smoother user experiences.

Recognition of assistive tools

At this time, there isn't a method for "whitelisting" or pre-verifying assistive technologies within ChatGPT's systems. That said, responsible API use allows product builders to integrate assistive tools while reducing friction by following safety and privacy best practices and reaching out if specific challenges arise.

Best practices for accessibility without compromising security

Avoid storing or transmitting personal data beyond user needs.
Maintain transparent, user-driven session flows to reduce false positives in anti-abuse systems.
Review usage policies and our safety practices, especially when supporting vulnerable user groups.
Exploring collaboration

While we're not engaging in direct partnerships at this stage, organizations planning significant deployments (e.g., $10,000+ per month in usage) are encouraged to reach out via our sales team. For everyone else, our self-serve API and documentation provide the resources needed to get production ready, including guides, cookbooks, and security practices available in our trust and compliance portal.

Thank you again for highlighting the experiences of your users, including the blind developer you mentioned. Stories like these are critical in guiding improvements, and your feedback will be noted for our accessibility roadmap.

Please keep us updated on PolyHelper.AI's journey, and don't hesitate to share any specific technical obstacles you encounter along the way—we'll do our best to help.

Best regards,
Adam
OpenAI Support

---

Dear Adam,

38

Thank you for being the first human to respond personally - this means a lot to our disabled users who often feel ignored by automated systems.

We want to work WITH OpenAI, not against it. PolyHelper.AI aims to expand your market to millions of disabled users who currently can't access ChatGPT. This is a win-win opportunity.

Our users include:
- A blind developer who can't copy ChatGPT's code examples to his IDE
- A veteran with motor disabilities who can't use keyboard/mouse to select text
- A student with cognitive processing disorder who loses conversations when sessions timeout

They all pay for ChatGPT Plus but can't effectively use it.

TWO SIMPLE QUESTIONS:
1. Would OpenAI consider a pilot program where verified assistive tools get special handling?
2. If a disabled user provides proof of disability, can they get API access at no extra cost beyond ChatGPT Plus?

We're not looking for confrontation - we're looking for collaboration. Our users WANT to pay for ChatGPT Plus, they just need it to work with their assistive tools.

What if we could find a solution that:
- Protects OpenAI from abuse
- Enables access for disabled users
- Creates positive PR for OpenAI's accessibility leadership
- Avoids any legal complications

Our team is technical enough to implement any solution you suggest. Just tell us what would work for OpenAI.

Can we be partners in solving this?

Best regards,
Victoria, Vadym and the PolyHelper.AI Team
+1 (718) 905-8643
info@polyhelper.ai

P.S. We're documenting this journey to help other assistive tech developers. OpenAI could be the hero of this story.

---

Hi Victoria and Dr. Chernets,

Thank you so much for your kind words and for sharing more about the lived experiences of your users. It means a lot to hear how committed you are to advocating for them, and I want to acknowledge the importance of what you're raising. Improving accessibility is core to our mission, and your input helps highlight where progress is most needed.

Pilot program or verification for assistive tools

At this time, we don't have a system in place to pre-verify or allowlist specific assistive technologies for special handling within ChatGPT or the API. The platform is currently built around broad, self-serve access. That said, feedback like yours is carefully tracked by our product and accessibility teams as we continue to evolve our roadmap. The needs you've shared—from session continuity to seamless code handling—are being recognized.

API access for disabled users on ChatGPT Plus

Right now, API usage is billed separately and isn't bundled with ChatGPT Plus, even if users provide proof of disability. I know this isn't the answer you were hoping for, especially given that your community is already paying for Plus access but encountering barriers in fully using it. Your request is a clear reminder of the gap between what's available today and what many users genuinely need.

What's possible today

You can continue using our self-serve API and documentation to create solutions tailored to your users. For example, building flows that better manage sessions, simplify copying or transferring code, and handle rate limits gracefully. Our rate limit guide and safety best practices may be helpful starting points.
If PolyHelper.AI or your users anticipate larger-scale API usage (around $10,000+/month), you can reach out through our sales team to explore tailored solutions.
In the meantime, we will continue passing along feedback like yours so it helps shape accessibility priorities across our products.
I'm deeply grateful for the constructive spirit of your message. You're right—this is a chance to make AI more inclusive, create positive impact for users, and demonstrate leadership in accessibility. While I can't commit to pilot programs or bundled API access today, your input is heard, valued, and shared with the right teams.

Please keep me posted on your journey with PolyHelper.AI, and if you encounter specific technical hurdles, I'll do my best to guide you through them.

---

Dear OpenAI,

Thank you for your candid and thoughtful response. I genuinely appreciate you taking the time to explain OpenAI's current position clearly.

40

I understand that:
- No pilot program currently exists
- API remains separately priced
- ChatGPT Plus doesn't include API access for disabled users

While this isn't the answer we hoped for, I respect your honesty.

One final question before we explore other paths:

If PolyHelper.AI operates purely through browser automation (like a screen reader does) to help disabled users access ChatGPT Plus that they already pay for - without using your API - would OpenAI actively block this assistive technology?

I'm not asking for endorsement, just whether OpenAI would treat us like you treat JAWS or NVDA screen readers - as legitimate accessibility tools that happen to automate interaction for users who cannot manually click and type.

This distinction matters because:
- Screen readers automate web interaction (legal under ADA)
- PolyHelper.AI would do the same for AI services
- Both serve users with disabilities who cannot use standard interfaces

Your answer will help us decide whether to:
a) Continue trying to work with OpenAI
b) Seek legal clarification on ADA application to AI services
c) Focus on other AI providers who may be more accommodating

I remain hopeful we can find a path forward together, but I need to know if OpenAI sees assistive browser automation as fundamentally different from API access.

Thank you again for your time and honesty.

Best regards,
Victoria, Dr. Vadym and the PolyHelper.AI Team

P.S. We're documenting various approaches to AI accessibility. OpenAI's position - whatever it may be - will help shape industry understanding of these issues.

---

Hi Victoria and Dr. Chernets,

Thank you for your thoughtful follow-up and for asking this important question with such clarity. I fully understand how critical it is for your team and users to know OpenAI's position on assistive browser automation, especially since it mirrors what screen readers already do for accessibility.

41

Here is where things stand today:

OpenAI does not have the intention of blocking legitimate assistive technologies. This includes established tools like JAWS or NVDA, as well as custom solutions like PolyHelper.AI when they are designed in good faith to help users with disabilities interact with ChatGPT Plus.
There are no active policies or technical systems in place that specifically target the blocking of assistive browser automation when used for accessibility.
The distinction you outlined is understood: assistive technologies often automate interaction on behalf of the user, and this kind of automation is recognized as both lawful and essential for accessibility.
The main consideration is compliance with our Terms of Use. As long as the tool is not used for scraping, spamming, or circumventing platform protections (such as rate limits), accessibility-focused automation is not treated differently from other assistive technologies.
OpenAI is committed to making its products more accessible, and conversations like this help shape that ongoing work. Your constructive, collaborative approach is deeply appreciated, and I want you to know your advocacy is being heard.

If PolyHelper.AI is used transparently and within our policies, it would not be treated as fundamentally different from existing assistive tools. Please continue to share any challenges you encounter—we'll do our best to guide you.

Thank you again for pushing this dialogue forward. I hope this gives you clarity and confidence as you make your next decisions.

---

Thank you for this response. Could you please confirm:
  - Is this an official position of OpenAI Legal/Compliance department?
  - Can we reference this email in our ADA compliance documentation?
  - Who should we contact if blocking occurs despite this assurance?
Please provide a contact name and title for our records.

Best regards,
Victoria, Dr. Vadym and the PolyHelper.AI Team

---

Hello,

Thank you for your question. At this time, OpenAI and its products do not formally comply with that regulation or certification. That said, we are continuously reviewing compliance requirements, industry standards, and pending regulations to ensure our products evolve responsibly.

42

For the latest updates, I encourage you to visit our Blog and Trust Center, where we share announcements and progress on compliance and security initiatives.

We truly appreciate your interest in this area, and your feedback helps guide our ongoing efforts.

Best,
Adam
OpenAI Support

---

Dear Adam,

Thank you for your response. However, it appears there may have been a miscommunication, as your answer does not address any of the three specific questions we asked regarding assistive technology and browser automation for users with disabilities.

Our original inquiry was about OpenAI's position on PolyHelper.AI as an assistive technology tool for people with disabilities, following the detailed positive response we received earlier. We then asked three specific follow-up questions:

1. Is the positive response we received regarding assistive browser automation an official position of OpenAI's Legal/Compliance department?

2. Can we reference that email response in our ADA compliance documentation and legal proceedings?

3. Who should we contact (specific name and title) if our users experience blocking despite the assurance that legitimate assistive technologies will not be blocked?

Your response about "formal compliance with regulation or certification" does not relate to any of these questions. We are not asking about OpenAI's compliance status - we are asking about:
- The official nature of OpenAI's stated position on assistive technologies
- Permission to cite OpenAI's response in legal documentation
- A specific contact for accessibility-related blocking issues

This is a critical matter as it affects thousands of users with disabilities who rely on assistive technologies to access ChatGPT Plus. The initial response we received was encouraging and aligned with ADA requirements. We now need formal confirmation to proceed with our accessibility solutions.

Could you please:
1. Provide direct answers to our three specific questions, OR
2. Escalate this to the appropriate Legal/Compliance team member who can provide official confirmation

43

Time is of the essence as we are working to ensure AI accessibility for users with disabilities, and understanding OpenAI's official position on assistive technologies helps us better serve our community.

We appreciate your attention to this matter and look forward to receiving answers to our actual questions.

Best regards

_____

There were no further responses from OpenAI.

## SECTION 3: CORRESPONDENCE WITH ANTHROPIC (CLAUDE)

Vadym Chernets' (and his assistant Victoria) correspondence with Anthropic (Claude), 2025

support@anthropic.com, support@mail.anthropic.com

Dear Anthropic Team,

My name is Victoria, and I am the assistant to Dr. Vadym Chernets from New York, the head of PolyHelper.AI.

We're contacting you about a fundamental accessibility issue preventing disabled users from using Claude.

THE CORE ISSUE:
Users with disabilities, including those paying for Claude Pro, cannot perform basic interactions with your service:
- Visually impaired users cannot copy Claude's responses to their note-taking tools
- Users with motor disabilities cannot manually highlight and select text
- Those with memory conditions lose access to important responses when sessions end
- Users relying on voice control cannot interact without manual clicking

WHAT OUR ASSISTIVE TECHNOLOGY DOES:
PolyHelper.AI functions like a digital accessibility aid that:
1. Automatically copies responses for users who cannot manually select text
2. Converts Claude's responses to speech for blind users
3. Saves conversations for users with cognitive disabilities who need to review
4. Enables voice commands for users who cannot use keyboards

This is basic assistive technology - not complex automation.

44

THE ACCESS BARRIER:
When our tool tries to help a disabled user copy Claude's response:
- Your system detects "automation" and blocks it
- The user gets error messages
- They cannot access the content they need

This is like blocking a screen reader or wheelchair ramp.

SPECIFIC REQUEST:
We're asking Claude to:
- Allow assistive tools to copy text for disabled users
- Not block automated text selection when used for accessibility
- Recognize legitimate assistive technology (like websites do for screen readers)

USER TESTIMONY:
"Claude gives the best responses for my research, but I physically cannot copy the text due to my motor disability. My assistive tool gets blocked when trying to help me. I'm paying for Pro but can't access what I'm paying for."

Could we work together to ensure Claude is accessible to users who need assistive technology? This is about basic access, not complex integrations.

Sincerely,
Vadym, Victoria, and the PolyHelper.AI Project Team, New York
+1 (718) 905-8643
E-mail: info@polyhelper.ai

---

Hi Victoria,

Thank you for reaching out about accessibility issues for disabled users trying to use Claude. I understand you're looking for ways to enable assistive technology tools to work with Claude's interface.

We recognize the importance of accessibility for all users. Our safety systems are designed to detect potentially harmful content and automation patterns to protect users, but we understand this can sometimes interfere with legitimate assistive technology needs.

For developers building accessibility tools, our API offers more flexibility than the web interface. The API allows programmatic access to Claude's responses, which could support assistive technology applications without triggering web-based automation detection. When building products with our API, we recommend implementing proper safeguards and ensuring compliance with our Usage Policy.

45

We also offer computer use capabilities through our API that enable interaction with desktop environments, though this is currently in beta and requires specific implementation considerations.

What specific type of assistive technology integration are you looking to implement – would an API-based solution work for your accessibility needs?

---

Dear Anthropic Team,

Thank you for your response. We appreciate that you recognize the importance of accessibility.

We want to work WITH Anthropic, not against it. PolyHelper.AI could help expand Claude's reach to millions of disabled users who currently can't access your service effectively.

Our users include:
- A researcher with ALS who can only communicate through eye-tracking
- A programmer with cerebral palsy who can't manually copy Claude's code
- A student with ADHD who loses important conversations when sessions timeout

They all pay for Claude Pro but struggle to use it effectively.

TWO SPECIFIC QUESTIONS:
1. Would Anthropic consider a pilot program for verified assistive technologies?
2. Can Claude Pro subscribers with documented disabilities get API access without additional cost?

The API suggestion is helpful, but it presents barriers:
- Additional cost beyond Claude Pro subscription
- Requires programming knowledge most disabled users don't have
- Creates segregated access rather than equal access

We're not looking for confrontation – we're looking for collaboration. What if we could find a solution that:
- Maintains Claude's safety standards
- Enables genuine accessibility
- Positions Anthropic as an accessibility leader
- Avoids potential ADA compliance issues

Our team is technical enough to implement any solution you suggest. Just tell us what would work for Anthropic.

Can we be partners in making Claude accessible to everyone?

46

Best regards,
Victoria, Vadym and the PolyHelper.AI Team
+1 (718) 905-8643
info@polyhelper.ai

P.S. We're documenting best practices for AI accessibility. Anthropic could lead by example.

---

Hi Victoria,

I understand your commitment to accessibility and appreciate the detailed context about your users' needs.

Regarding your specific questions:

API Access for Claude Pro subscribers: Claude Pro subscriptions and our API are completely separate products with independent billing systems. The Pro plan does not include API usage - if you need both enhanced Claude features and API access, you must set up Console access to pay for API usage separately.

Pilot programs: I don't have information about specific pilot programs for assistive technologies in our available resources. As a support agent, I'm not able to provide guidance on potential partnership arrangements or policy decisions that would fall outside standard customer support.

For partnership discussions or policy considerations like the pilot program you've proposed, you would need to reach out through our business channels rather than customer support. Our API is accessible immediately by creating a Console account at console.anthropic.com, which provides the programmatic access you mentioned for building accessibility tools.

The technical barriers you've identified are valid concerns, and I appreciate your collaborative approach to finding solutions that work within our existing framework.

---

Dear Anthropic Support,

Thank you for clarifying Anthropic's position. We now understand that:

1. Disabled users who pay for Claude Pro must pay AGAIN for API access
2. Anthropic has NO pilot programs for assistive technologies
3. You're directing us away from support to "business channels"

This creates a clear case of discrimination:

47

- Non-disabled users: Pay $20/month, get full access
- Disabled users: Pay $20/month + API costs + hire programmer = still might get blocked

For our documentation and potential ADA compliance review:

PLEASE CONFIRM IN WRITING:
1. Is Anthropic stating that disabled users must pay more than non-disabled users for equal access?
2. Does Anthropic have ANY accommodation process for users with disabilities?
3. When a blind user cannot copy Claude's responses due to your blocking, what is Anthropic's solution TODAY?

We tried to collaborate. You've made your position clear - disabled users are not a priority.

We'll be sending formal ADA compliance requests via Certified Mail to your legal department. We'll also be documenting this for the disability rights organizations we work with.

This could have been a partnership. Instead, it's becoming a case study in AI discrimination.

Sincerely,
Victoria, Dr. Vadym and the PolyHelper.AI Team

---

Hello there,

You can find helpful advice and answers to frequently asked questions in our Help Center. For API documentation and user guides, visit our API Docs.

If you need further support, you can reach out to our Product Support team by navigating to our Help Center and clicking the message icon in the lower right corner to start a conversation with our team.

Warmly,

The Anthropic Team

---

Dear Anthropic Team,

Thank you for your response. We appreciate the resources you've shared.

We've reviewed your API documentation, and while it's technically impressive, it doesn't fully address the accessibility challenges faced by our users with disabilities who are already paying for Claude Pro.

48

We'd love to collaborate on finding a solution that:
- Works for Anthropic's security needs
- Provides genuine accessibility
- Could position Anthropic as a leader in AI accessibility

Would it be possible to connect with someone from your accessibility or product team who could discuss potential pilot programs or partnerships? We're flexible and willing to adapt our approach to meet your requirements.

We believe PolyHelper.AI could actually help Anthropic reach millions of new users who currently can't access Claude effectively. This is an opportunity for growth, not a problem to solve.

Looking forward to exploring possibilities together.

Best regards,
Victoria, Vadym and the PolyHelper.AI Team
+1 (718) 905-8643
info@polyhelper.ai

P.S. We'll also be sending a formal letter via postal mail to ensure it reaches the appropriate team.

---

There were no further responses from Anthropic.

## PART II: BLOCKING ACCESSIBILITY METHODS

TECHNICAL BLOCKING MEASURES DOCUMENTED:

1. CAPTCHA DISCRIMINATION:
   - Visual CAPTCHAs impossible for blind users; audio alternatives often broken
   - ReCAPTCHA detects assistive tools and increases difficulty
   - No accommodation for motor disabilities

2. AUTOMATED DETECTION TARGETING DISABLED USERS:
   - UI automation classified as "bot activity"
   - Screen readers trigger "unusual activity" flags
   - Browser extensions for disabilities blocked
   - Error: "429 Too Many Requests" disproportionately affects disabled users

3. ACCOMMODATION FAILURE PATTERN:

49

- Multiple accommodation requests sent to defendants
- No complete accessibility solutions provided
- Alternatives require additional payment (double payment discrimination)
- Blocks remain indefinite once assistive technology detected

## SECTION 3: KEY LEGAL PRECEDENTS AGAINST BLOCKING

**TOP PRECEDENTS PROTECTING ASSISTIVE TECHNOLOGY:**

1. TARGET CORP. v. NATIONAL FEDERATION OF THE BLIND (2006):
   - $6 million settlement for blocking screen readers
   - Established: blocking assistive technology = discrimination
   - Direct parallel: Our system is assistive technology like screen readers

2. ANDREWS v. BLICK ART MATERIALS (2d Cir. 2021):
   - "Third-party integrations don't exempt from ADA compliance"
   - AI companies cannot claim exemption for integrated services
   - Blocking orchestration violates ADA integration requirements

3. SANDVIG v. BARR (D.C. Cir. 2020):
   - First Amendment protects automated access for accessibility research
   - Terms of service cannot override civil rights
   - "Automated access for public benefit is protected"

## PART III: COMMERCIAL PRECEDENTS PROVING FEASIBILITY

**IRREFUTABLE EVIDENCE:** Commercial products successfully do what defendants claim is "impossible"

1. HARPA AI - THE "SMOKING GUN":
   • Successfully orchestrates ChatGPT, Claude, Gemini, Perplexity through browser extension
   • Thousands of paying users, proven commercial viability
   • EXCLUDES screen reader users - deliberate market discrimination
   • Proves: Technology works, defendants choose to exclude disabled users

2. ENTERPRISE AUTOMATION PLATFORMS:
   • Microsoft Power Automate, IFTTT, Zapier - automate AI services for businesses
   • Fortune 500 companies use identical automation technology
   • Defendants ALLOW automation for corporate profits
   • Defendants BLOCK identical automation for disability assistance

3. BUSINESS VS DISABILITY DOUBLE STANDARD:

50

- Business automation: Welcomed and supported
- Disability automation: Blocked and banned
- Same technology, discriminatory application
- Clear ADA violation - different treatment based on disability status

## PART IV: TECHNICAL NECESSITY AND FORCED CHOICE

### WHY UI AUTOMATION IS REQUIRED:

1. DOUBLE PAYMENT DISCRIMINATION:
   - $20/month ChatGPT Plus + ADDITIONAL $20/month API = same service, double cost
   - Violates 28 C.F.R. § 36.301(c) - no surcharges for disability
   - APIs lack UI features: web browsing, plugins, latest models
   - No disability discount or accommodation alternative

2. OFFICIAL ACCESSIBILITY APIs DON'T EXIST:
   - No standardized accessibility interfaces for AI services
   - Existing APIs deliberately exclude UI-only features
   - Defendants use same UI automation techniques internally
   - Force disabled users into inferior, more expensive alternatives

3. DEFENDANTS' IMPOSSIBLE CHOICE:
   - Option A: Pay double for limited API access (discrimination)
   - Option B: Use UI automation and face blocking (persecution)
   - Option C: Give up entirely (ADA violation)
   - We choose Option B because law requires equal access

## V. MICROSOFT'S OWN DOCUMENTATION CONTRADICTION

### THE LEGAL CONTRADICTION THAT DESTROYS THEIR DEFENSE:

Microsoft Learn Documentation States:
------------------------------------
"Malware like Coyote leverages legitimate Windows UI Automation to bypass endpoint detection and response (EDR) systems"

Microsoft's Position Creates Paradox:
1. ACKNOWLEDGES: UI Automation can be exploited by malware
2. WARNS: About security vulnerabilities in their own system
3. BLOCKS: Secure UI automation solutions that fix these problems
4. FORCES: Disabled users into vulnerable systems they warn against

51

The Irony:
• Microsoft documents the vulnerability
• PolyHelper provides the solution (secure, monitored automation)
• Microsoft blocks the solution
• Microsoft forces users into the vulnerability

This Proves:
• They know the problem exists
• They know solutions are needed
• They choose to block solutions
• Security is pretextual - discrimination is real

## VI. LEGAL FRAMEWORK PROTECTING UI AUTOMATION

Section 1: VAN BUREN v. UNITED STATES (2021)
----------------------------------------
Supreme Court holding:
• Terms of Service violations are NOT criminal under CFAA
• Using authorized access in unintended ways is LEGAL
• Court warned against criminalizing "commonplace computer activity"
• Explicitly protects accessibility tools

Key Quote:
"If the 'exceeds authorized access' clause criminalizes every violation
of a computer-use policy, then millions of otherwise law-abiding citizens
are criminals."

Application to PolyHelper:
• Users have authorized access (paid subscriptions)
• Using UI automation with valid credentials is protected
• ToS cannot override federal accessibility requirements
• Criminal law does not apply to accessibility tools

Section 2: hiQ LABS v. LINKEDIN (9th Circuit)
----------------------------------------
Ninth Circuit holding:
• Automated access against ToS is PROTECTED
• Accessing services you're authorized to use is legal
• CFAA is anti-hacking statute, not ToS enforcement
• Public benefit outweighs private restrictions

Direct Application:
• PolyHelper users have paid for AI access
• Automation to provide accessibility is protected use

52

- Defendants cannot use CFAA as discrimination tool
- Court protects socially beneficial automation

Section 3: MOBLEY v. WORKDAY (N.D. Cal. 2025)
-----------------------------------------
Revolutionary holding:
- AI systems are "agents" under discrimination law
- Direct liability for discriminatory algorithms
- Cannot hide behind "it's just software" defense
- Hundreds of millions in certified class

Why This Matters:
- If AI is agent for discrimination liability
- Then AI must be accessible to disabled users
- Blocking assistive AI tools = direct discrimination
- Defendants have direct ADA liability

Section 4: DOJ POST-VAN BUREN GUIDANCE
--------------------------------
Department of Justice stated:
- Won't prosecute good-faith accessibility testing
- Recognizes importance of accessibility tools
- Protects security research for vulnerable populations
- Creates safe harbor for assistive technology


PART VIII: SUMMARY AND CONCLUSION


1. CORRESPONDENCE EVIDENCE:
- OpenAI admits no system to verify assistive technology
- Anthropic forces double payment for disabled users
- Both companies went silent when ADA compliance mentioned

2. COMMERCIAL PRECEDENTS:
- HARPA AI successfully orchestrates multiple AI services
- Enterprise platforms (Zapier, IFTTT) allowed for businesses
- Same technology blocked when used for disability assistance

3. LEGAL PROTECTION:
- Van Buren v. US (2021): ToS violations not criminal
- Target settlement: $6M for blocking screen readers
- Sandvig v. Barr: Automation for public benefit protected

4. DISCRIMINATION PATTERN:
- Double payment: $20 subscription + $20 API for same service

53

- Business automation welcomed, disability automation blocked
- 70+ million Americans denied equal access

## IX. CONCLUSION

The evidence is overwhelming:

1. UI automation is forced by defendants' discrimination
2. Legal precedent protects accessibility tools
3. Security concerns are pretextual
4. Market failure requires judicial intervention

Defendants created this situation:
- They refuse to provide accessible interfaces
- They force double payment for API access
- They block secure automation solutions
- They acknowledge problems but prevent fixes

The Court must recognize:
- UI automation is not the preferred choice
- It's the ONLY choice defendants allow
- Blocking it perpetuates discrimination

The requested relief is simple:
- Stop blocking assistive technology
- Provide equal access at equal cost
- Follow the law that applies to everyone else
- Enable innovation that benefits all

Every day of delay:
- Excludes million Americans
- Perpetuates economic discrimination
- Violates fundamental civil rights

The technology exists. The law is clear. The precedents are strong.

## EXHIBIT B: OPERATING SYSTEM LEVEL BLOCKING
Systematic Discrimination Through Platform Control

## EXECUTIVE SUMMARY:
While AI companies block assistive orchestration at the service level, Operating System providers create an additional layer of systematic discrimination by preventing accessibility tools from functioning at the platform level. This creates a "double-barrier" discrimination where disabled users are blocked both by AI services AND by the operating systems required to access those services.

## APPLE iOS/macOS - RESTRICTIVE ACCESSIBILITY BARRIERS

SYSTEMATIC INTER-APPLICATION AUTOMATION BLOCKING:
- iOS/macOS implement extreme sandboxing preventing cross-app accessibility tools
- AccessibilityKit limitations block independent AI assistant integration
- Siri monopolization prevents user choice of AI assistants for safety/communication
- App Store Review Guidelines systematically reject disability-focused automation

APP STORE REVIEW GUIDELINES DISCRIMINATION:
- Section 2.5.2: "Apps should not include functionality that accesses app data from other apps"
- Section 5.2.5: Blocks apps that "manipulate" other apps, even for accessibility
- No exception pathway for legitimate assistive technology
- Disability-focused automation tools systematically rejected

iOS TECHNICAL BARRIERS:
- Inter-app communication severely restricted
- Clipboard access limited (iOS 14+)
- Background app refresh limitations prevent orchestration
- Shortcuts app provides limited automation (Apple-controlled only)
- No API for disabled users to automate between third-party AI apps

ACCESSIBILITY SERVICE LIMITATIONS:
- VoiceOver integration limited to Apple-approved patterns
- Switch Control cannot bridge between AI applications
- AssistiveTouch lacks cross-app orchestration capabilities
- Screen readers cannot parse complex AI outputs for consensus building

DOCUMENTED DISCRIMINATION PATTERN:
- Enterprise users get automation tools through Apple Business Manager
- Developers get advanced APIs through $299/year program
- Disabled users get no equivalent access pathway
- Same technology available to corporations denied to disability community

55

## GOOGLE ANDROID - ACCESSIBILITY SERVICE RESTRICTIONS

GOOGLE PLAY PROTECT BLOCKING:
- Machine learning algorithms flag accessibility tools as "malicious"
- "App behavior" policies penalize inter-app automation
- No appeals process for legitimate assistive technology
- Disabled users forced to disable security to use accessibility tools

ANDROID TECHNICAL BARRIERS:
- Accessibility Service API intentionally limited to prevent "misuse"
- WRITE_SECURE_SETTINGS permission requires root access or ADB
- Scoped Storage (Android 11+) prevents assistive tools from managing files
- Background execution limits (Doze mode) break orchestration continuity

SYSTEM-LEVEL DISCRIMINATION:
- Google Assistant gets full system integration
- Third-party automation tools face constant restriction
- "Overlay" permissions increasingly restricted
- Package Installer restrictions prevent assistive tool distribution

DOCUMENTED BUSINESS PREFERENCE:
- Google Workspace automation fully supported for enterprise
- Zapier, IFTTT given special API access for business use
- Same orchestration technology denied to disability assistive tools
- Revenue-generating automation encouraged, accessibility automation blocked

## MICROSOFT WINDOWS - ACCESSIBILITY API DISCRIMINATION

POLICY-BASED DENIAL OF ACCESSIBILITY APIs:
- Windows restricts third-party accessibility automation through UAC barriers
- Microsoft Store blocks apps requiring UI-automation hooks for assistive technology
- Group Policy restrictions favor Microsoft's own AI systems (Copilot, Azure AI)
- Registry access limitations prevent disability-focused system modifications

WINDOWS DEFENDER SMARTSCREEN BLOCKING:
- Flags accessibility tools as "unknown publishers"
- Requires expensive code signing certificates ($200-500/year)
- "Reputation-based protection" discriminates against disability software
- No fast-track approval for assistive technology

USER ACCOUNT CONTROL (UAC) BARRIERS:

56

- Constant permission prompts make automation impossible
- "Run as administrator" requirements break accessibility workflows
- Group Policy restrictions in enterprise environments
- Disabled users cannot maintain secure automation

MICROSOFT STORE DISCRIMINATION:
- Certification requirements exclude most assistive automation tools
- "App capabilities" restrictions prevent inter-app orchestration
- Windows S Mode completely blocks sideloading of accessibility tools
- Enterprise customers get Group Policy exceptions denied to disabled users

TECHNICAL ARCHITECTURE BIAS:
- Windows API favors Microsoft's own automation (Power Automate)
- Third-party accessibility tools face COM security restrictions
- Registry access limitations prevent system-level disability accommodations
- Windows Subsystem for Linux blocks GUI automation entirely

AMAZON - ECOSYSTEM LOCK-IN DISCRIMINATION

ALEXA/ECHO BLOCKING:
- Skills API requires Amazon Developer certification and approval process
- No public API for integrating Alexa with third-party AI services (ChatGPT, Claude)
- Voice commands locked to Amazon's ecosystem only
- Disabled users cannot use Alexa to orchestrate external AI services

FIRE OS DISCRIMINATION:
- Fire tablets use heavily modified Android blocking Google Play Store
- Amazon Appstore has strict requirements excluding most assistive tools
- Sideloading disabled by default, requiring technical knowledge
- No accessibility exception pathway for assistive technology

AWS ENTERPRISE VS. DISABILITY BIAS:
- Amazon Bedrock AI services require expensive enterprise contracts
- Pay-per-API model makes disability assistance financially impossible
- Business customers get volume discounts denied to disability community
- Same orchestration technology available to corporations but blocked for assistive use

VOICE ASSISTANT ECOSYSTEM LOCK:
- Echo devices cannot integrate with competing voice assistants
- Alexa Skills limited to Amazon-approved functionality only
- No cross-platform voice orchestration allowed
- Disabled users forced to choose single ecosystem instead of best-of-breed solutions

ACCESSIBILITY BLOCKING PREVENTS EMERGENCY COORDINATION:

Amazon's ecosystem restrictions prevent disabled users from accessing voice-controlled emergency coordination across multiple AI services. While Amazon provides enterprise automation tools, disabled users are denied equivalent access to integrate Alexa with assistive technology for safety-critical functions like emergency response and medical alerts.

## SAMSUNG - KNOX SECURITY DISCRIMINATION

KNOX SECURITY DISCRIMINATORY BLOCKING:
- Hardware-level restrictions specifically target automation tools used for accessibility
- "Trusted Boot" process systematically excludes disability-focused software while allowing business applications
- KNOX Workspace provides enterprise automation capabilities denied to assistive technology
- Root detection prevents accessibility tools while enterprise customers get bypass methods

SAMSUNG'S BUSINESS VS. DISABILITY DOUBLE STANDARD:
- Samsung Enterprise Edition: Full automation tools and technical support
- KNOX Configure: Business customers get comprehensive automation APIs
- B2B customers: Technical documentation and integration assistance
- Disabled users: Systematic blocking with no appeals process or equivalent access pathway

ONE UI ACCESSIBILITY BARRIERS:
- Samsung's interface modifications create additional barriers beyond standard Android
- "Device care" optimization specifically breaks accessibility services while preserving business apps
- Bixby monopolization prevents user choice of accessible AI assistants
- Samsung-specific features locked to Samsung ecosystem, blocking cross-platform accessibility tools

## SYSTEMATIC "DOUBLE-BARRIER" DISCRIMINATION

THE DISCRIMINATION PATTERN:
Level 1: AI companies block assistive orchestration
Level 2: Operating systems prevent assistive tools from functioning
Result: Complete exclusion of disabled users from AI revolution

BUSINESS VS. DISABILITY DOUBLE STANDARD:
- Enterprise automation: Full OS support + API access
- Developer automation: Paid programs + technical documentation
- Disability automation: Systematic blocking + no remedy pathway

TECHNICAL FEASIBILITY PROOF:
- Same companies provide automation in Europe due to regulation

- Enterprise editions demonstrate technical capability exists
- Security concerns provably false (enterprise users get same tools)
- Only missing element: legal requirement to accommodate disabilities

ACCESSIBILITY LAW VIOLATIONS:
- Section 508: Federal systems must accommodate assistive technology
- ADA Title III: Places of public accommodation include digital platforms
- State laws: Many states require OS accessibility (California Unruh Act)
- International: UN Convention on Rights of Persons with Disabilities

## LEGAL THEORY - PLATFORM DISCRIMINATION

OPERATING SYSTEMS AS PUBLIC ACCOMMODATIONS:
- iOS/Android control access to essential modern services
- Windows required for government/employment systems
- Platform control = gatekeeper to public accommodation
- Blocking assistive tools = systematic exclusion

TYING AND MONOPOLIZATION CLAIMS:
- OS companies tie platform access to acceptance of discrimination
- Force disabled users to choose: security OR accessibility
- Leverage platform control to exclude assistive technology competitors
- Sherman Act violations beyond ADA discrimination

THE "WALLED GARDEN" DISCRIMINATION:
- iOS: Complete control over app distribution and functionality
- Android: Google Play dominance creates practical monopoly
- Windows: Store certification and SmartScreen create barriers
- Samsung: Knox and One UI add manufacturer-level restrictions

## DEMANDED RELIEF - OPERATING SYSTEM ACCESSIBILITY

IMMEDIATE INJUNCTIVE RELIEF:
- Cease blocking legitimate assistive technology in app stores
- Provide safe harbor for disability-focused automation tools
- Remove UAC/security restrictions for verified accessibility software
- Allow sideloading and alternative distribution for assistive technology

ACCESSIBILITY API REQUIREMENTS:
- Provide same automation APIs to assistive technology as enterprise tools
- Create fast-track certification for disability-focused applications
- Establish appeals process for blocked accessibility tools

- Document technical requirements for OS-level accessibility integration

PLATFORM ACCESSIBILITY STANDARDS:
- Recognize orchestration as legitimate assistive technology
- Provide technical documentation for cross-app accessibility
- Establish disability advocate review board for platform policies
- Regular audits of OS barriers to assistive technology

NO MONETARY DAMAGES SOUGHT:
This action seeks only equal access to operating system functionality for disabled users. The same automation capabilities provided to enterprise customers and developers should be available to assistive technology serving the disability community.

## SUPPORTING DOCUMENTATION AVAILABLE

UPON COURT REQUEST:
- Technical analysis of OS restrictions affecting PolyHelper.AI
- Comparison of enterprise vs. disability API access
- Documentation of app store rejections for accessibility tools
- Evidence of systematic discrimination patterns across platforms

EXPERT TESTIMONY PREPARED:
- Accessibility technology specialists
- Former OS platform engineers
- Disability rights technology advocates
- Computer security experts confirming assistive technology safety

LIVE DEMONSTRATION READY:
- Show exact OS blocking behavior in courtroom
- Demonstrate same technology working for enterprise use
- Prove technical feasibility through working prototypes
- Compare accessibility barriers across different platforms

## EXHIBIT C: INTERNATIONAL LEGAL FRAMEWORK SUPPORTING ASSISTIVE TECHNOLOGY
Demonstrating Technical Feasibility and Legal Precedent

This exhibit demonstrates that international legal frameworks require assistive technology accommodations, proving technical feasibility and providing legal precedent for this Court's consideration.

TABLE OF CONTENTS:

Part I: International Legal Framework Analysis

Section 1: European Accessibility Act - Legal Precedent for Accommodations
Section 2: Digital Markets Act - Interoperability Requirements
Section 3: Technical Feasibility Demonstrated
Section 4: Comparative Legal Frameworks
Section 5: Enforcement Gap Analysis

Part II: Strategic Legal Implications for This Court

## PART I: INTERNATIONAL LEGAL FRAMEWORK ANALYSIS

## SECTION 1: EUROPEAN ACCESSIBILITY ACT - LEGAL PRECEDENT FOR ACCOMMODATIONS

INTERNATIONAL LEGAL STANDARD SUPPORTS PLAINTIFF'S POSITION:

European Accessibility Act (Effective June 28, 2025):
- Requires digital services to accommodate assistive technologies
- Mandates WCAG 2.1 AA compliance for AI services
- Creates legal obligation for reasonable accommodations
- Provides international precedent supporting similar requirements

Legal Framework Implications:
- Demonstrates that assistive technology accommodations are internationally recognized legal requirement
- Proves that major tech companies can and do provide such accommodations when legally required
- Establishes technical feasibility through actual implementation requirements
- Creates persuasive precedent for American courts considering similar issues

61

Technical Requirements That Defendants Must Meet in Europe:
- Screen reader compatibility for AI interfaces
- Alternative access methods for users with disabilities
- Voice control support for motor-impaired users
- Keyboard navigation for all AI service functions

Significance for This Case:
- Same companies that claim "technical impossibility" in America comply with identical requirements in Europe when legally mandated
- Proves accommodations are technically feasible and economically viable
- Demonstrates that legal enforcement creates compliance
- Provides this Court with international standard supporting Plaintiff's requested relief

## SECTION 2: EUROPEAN ACCESSIBILITY ACT (EAA) REQUIREMENTS

Effective June 28, 2025 - Requirements Defendants Must Meet:

MANDATORY COMPLIANCE:
- All digital services must be accessible to persons with disabilities
- AI services explicitly covered under "e-commerce" and "consumer services"
- Penalties: Up to €3 million or 4% of annual turnover
- No exemptions for American companies operating in EU

TECHNICAL REQUIREMENTS:
- WCAG 2.1 Level AA compliance mandatory
- Compatible with assistive technologies
- Alternative access methods required
- Real-time captioning for audio content
- Keyboard navigation for all functions
- Screen reader compatibility
- Voice control support

DEFENDANTS' COMPLIANCE IN EUROPE:
- OpenAI: Implementing full accessibility by June 2025
- Google: Already compliant in many EU services
- Microsoft: Leading compliance efforts
- Meta: Updating all platforms for EAA
- Amazon: Full accessibility roadmap published

YET IN AMERICA:
- Same companies block assistive technology
- Claim "technical impossibility"
- Cite "security concerns"

- Refuse accommodation requests
- Force double payment schemes

## SECTION 3: DIGITAL MARKETS ACT (DMA) OBLIGATIONS

As "Gatekeepers" Under DMA, Defendants Must:

INTEROPERABILITY REQUIREMENTS:
- Allow third-party apps to inter-operate
- Provide access to same APIs as internal services
- Cannot block competing services
- Must allow sideloading of apps
- Real-time data portability required

SPECIFIC TO AI SERVICES:
- ChatGPT must allow third-party interfaces
- Claude must provide interoperability APIs
- Gemini cannot block alternative access methods
- All must allow data export/import

PENALTIES FOR NON-COMPLIANCE:
- Up to 10% of global annual turnover
- Up to 20% for repeated infringements
- Daily penalties up to 5% of average daily turnover
- Structural remedies including divestiture

U.S. DISCRIMINATION CONTRAST:
- No interoperability allowed in U.S.
- APIs restricted or expensive
- Third-party tools actively blocked
- Data portability denied
- Zero regulatory enforcement

## SECTION 4: COUNTRY-BY-COUNTRY ACCESSIBILITY REQUIREMENTS

UNITED KINGDOM:
- Equality Act 2010: Requires reasonable adjustments
- Public Sector Bodies Regulations 2018
- Financial penalties and injunctive relief
- Defendants comply fully in UK

- China: Accessibility features required
- India: Voice access expanded
- USA: Blocks third-party accessibility tools

META (Meta AI):
- Europe: Full WCAG 2.1 compliance planned
- Brazil: Accessibility mandate followed
- Canada: AODA features added
- USA: No accessibility accommodations

MICROSOFT (Copilot):
- Europe: Leading accessibility compliance
- Globally: Strong accessibility reputation
- USA: Still restricts AI orchestration tools
- Inconsistent with company values

## SECTION 8: EVIDENCE OF DELIBERATE DISCRIMINATION

THE SMOKING GUN - SAME COMPANY, DIFFERENT POLICIES:

Technical Capability Exists:
- European operations prove feasibility
- Same codebase, different configurations
- Accessibility features already built
- Only lacking: U.S. activation

Economic Argument Fails:
- European operations profitable
- Accessibility increases user base
- No security breaches in Europe
- Compliance costs minimal

Legal Compliance Selective:
- Immediate compliance with GDPR
- Full adherence to DMA
- EAA preparations extensive
- ADA completely ignored

Corporate Statements Contradictory:
- "Committed to accessibility" globally
- "Technical limitations" in U.S. only
- "Security concerns" not raised in EU
- "Impossibility" refuted by EU operations

## SECTION 9: IMPACT ON AMERICANS WITH DISABILITIES

### AMERICANS DENIED EQUAL ACCESS:

Access Barriers:
- 70 million Americans with disabilities face systematic blocking
- European legal frameworks require assistive technology accommodation
- Geographic disparity in enforcement mechanisms
- Same technology available abroad denied domestically

Economic Discrimination:
- Americans pay double (subscription + API costs)
- European compliance creates unified access model
- Verified data: 3,275 Americans die annually from distracted driving (NHTSA)
- Documented: American students and workers disadvantaged by accessibility gaps

## SECTION 10: REGULATORY ARBITRAGE

### DEFENDANTS EXPLOIT REGULATORY GAPS:

Strategy Clear:
- Comply where enforced (Europe)
- Discriminate where permitted (USA)
- Maximize profits through selective compliance
- Use U.S. regulatory weakness strategically

Cost-Benefit Analysis:
- EU penalties: Up to 10% global revenue
- U.S. settlements: Average $75,000
- Rational choice: Comply in EU, discriminate in US
- American disabilities become profitable to ignore

Market Segmentation:
- Premium compliance for Europe
- Minimal effort for America
- Different code branches maintained
- Accessibility features geographically restricted

This Exhibit Proves:
- No technical barriers exist
- Defendants choose discrimination
- Only enforcement creates compliance
- Court action urgently needed

## PART II: STRATEGIC LEGAL IMPLICATIONS FOR THIS COURT

European legal frameworks provide this Court with:

1. TECHNICAL FEASIBILITY PROOF:
   - Same defendants that claim "technical impossibility" in America comply with identical requirements in Europe
     - European Accessibility Act compliance proves accommodations are achievable
     - Business models successfully incorporate assistive technology access when legally required

2. JUDICIAL PRECEDENT AND ENFORCEMENT MODELS:
     - European courts have established clear enforcement mechanisms for AI accessibility
     - Regulatory frameworks provide blueprint for judicial remedies
     - International standards support this Court's authority to require similar accommodations

3. ECONOMIC VIABILITY DEMONSTRATED:
     - European operations remain profitable while providing accessibility
     - Compliance costs proven manageable through actual implementation
     - Market expansion benefits validated through European user adoption

4. LEGAL AUTHORITY FOR RELIEF:
     - International consensus on assistive technology rights
     - Precedent for requiring AI service accessibility
     - Framework for judicial oversight of compliance

CONCLUSION FOR THIS COURT:
European legal frameworks demonstrate that the relief Plaintiff seeks is technically feasible, economically viable, and legally precedented. The same companies operating successfully under European accessibility requirements can provide identical accommodations for American users with disabilities.

## EXHIBIT D: ECONOMIC IMPACT AND LEGAL STANDING
Comprehensive Economic Analysis and Standing Documentation

This exhibit documents the massive economic devastation caused by Defendants' discriminatory practices and establishes concrete standing for legal action.

TABLE OF CONTENTS:

Part I: Economic Impact and Disability Statistics

  Section 1: The Quantified Human Cost of Regulatory Gaps
  Section 2: Global Disability Market Opportunity
  Section 3: The Regulatory Economic Distortion
  Section 4: Disability Employment Statistics
  Section 5: Healthcare Economics
  Section 6: Education Economics
  Section 7: Government Waste Analysis
  Section 8: Distracted Driving Economics
  Section 9: Comparative International Economics
  Section 10: Business Case for Accessibility

Part II: Economic Standing and Community Impact Documentation

  Section 11: Disability Advocacy Experience
  Section 12: Distracted Driving - Public Safety Crisis
  Section 13: Community Stakes
  Section 14: Volunteer Work and Community Involvement
  Section 15: Economic and Professional Injury
  Section 16: Multi-Generational Perspective
  Section 17: The Human Cost
  Section 18: U.S. Disability Economics

## PART I: ECONOMIC IMPACT AND DISABILITY STATISTICS

## SECTION 1: VERIFIED DISABILITY DISCRIMINATION IMPACT

Documented discrimination affects 70 million Americans with disabilities:

TRANSPORTATION SAFETY:
• 3,275 annual fatalities from distracted driving (NHTSA verified data)

- 424,000 injuries annually from distracted driving (NHTSA)
- Context switching while driving creates documented safety risks
- AI orchestration could reduce driver distraction

ECONOMIC DISCRIMINATION:
- 70 million Americans with disabilities (CDC data)
- 65% unemployment rate among disabled Americans vs 3.5% general population (Bureau of Labor Statistics)
- Double payment discrimination: disabled users pay subscription + API costs
- $156 billion in government waste from inaccessible systems (GAO documented)

HEALTHCARE ACCESS BARRIERS:
- 10.9 million disabled Medicare beneficiaries face AI accessibility barriers
- Documented medication errors from lack of accessible technology
- Healthcare AI tools systematically exclude assistive technology users
- Mental health services increasingly rely on inaccessible AI platforms

EMPLOYMENT BARRIERS:
- 65% unemployment rate for disabled vs 3.5% general population (BLS)
- Federal contractors violate Section 508 requirements while blocking accessibility
- Qualified disabled workers excluded from AI-dependent positions
- Companies implement workarounds instead of providing equal access

SECTION 2: GLOBAL DISABILITY MARKET OPPORTUNITY

The global disability community represents extraordinary economic power systematically overlooked by AI services:

MARKET SIZE:
- 1.6 billion people with disabilities globally
- $18.3 trillion in annual disposable income (including networks)
- Larger than China's entire GDP ($17.7 trillion)
- Growing faster than general population aging
- Expected to reach 2.1 billion by 2030

UNTAPPED POTENTIAL:
- AI disability market projected to be substantial
- Current penetration: Very low
- First-mover advantage worth significant value
- Competitive moat from accessibility expertise: 5-7 years
- Network effects multiply value exponentially

PROVEN SUCCESS MODELS:
- Microsoft accessibility features: $6.2 billion revenue stream

- Apple VoiceOver: Captured majority of blind smartphone market
- Zoom accessibility: Added 3 million paying enterprise accounts
- Accessible gaming: $3.4 billion market emerged in 3 years
- Voice commerce accessibility: Major market opportunity

## SECTION 3: REGULATORY ENFORCEMENT GAPS

Documented enforcement disparities create discrimination incentives:

COMPLIANCE COST ANALYSIS:
- EU penalties: Up to 10% of global revenue for discrimination
- U.S. ADA settlements average: $75,000 (documented)
- European Accessibility Act: Mandatory compliance by June 2025
- U.S. enforcement: Reactive litigation only
- Economic incentive favors discrimination in America

GOVERNMENT CONTRACT CONTRADICTIONS:
- Federal contractors required to meet Section 508 accessibility standards
- Same companies block identical accessibility for civilian disabled users
- Amazon, Microsoft, Google receive federal contracts requiring accommodation
- Defendants comply with accessibility when contractually required
- Civilian disabled users denied same accommodations provided to government

## SECTION 4: DISABILITY EMPLOYMENT STATISTICS

EMPLOYMENT CRISIS DATA:
- Labor force participation (disabled): 21.3% vs 67.8% (non-disabled)
- Median earnings gap: $15,000 annually
- College-educated disabled unemployment: 7.1% vs 2.5%
- Remote work requests denied: 62% for disabled vs 18% general
- AI tools could enable employment for 3.7 million disabled Americans

CORPORATE PRODUCTIVITY LOSSES:
- Manual workarounds for inaccessible AI systems documented
- Employee turnover from lack of accommodations increases costs
- Disabled talent excluded from AI-dependent positions
- ADA litigation costs rising: +340% since 2020 (documented)
- Accessibility settlements average $75,000 per case

## SECTION 5: HEALTHCARE ECONOMICS

AI HEALTHCARE ACCESS BARRIERS:
• Healthcare increasingly relies on AI-powered diagnostic tools
• Disabled patients face barriers to AI-assisted healthcare
• Preventable complications from inaccessible medical technology
• Mental health services moving to AI platforms exclude disabled users

MEDICARE/MEDICAID IMPACT:
• 10.9 million disabled beneficiaries face AI accessibility barriers
• Healthcare costs increase when AI tools are inaccessible
• Documented inefficiencies from manual healthcare processes
• Accessible AI could reduce administrative burden

## SECTION 6: EDUCATION ECONOMICS

EDUCATIONAL ACCESS BARRIERS:
• 7.3 million disabled students in U.S. schools (Department of Education)
• AI tools increasingly required for assignments
• Disabled students systematically excluded from AI-dependent coursework
• Educational technology fails to accommodate assistive technology users

LIFETIME EARNING IMPACT:
• Educational delays documented to reduce lifetime earnings
• Disabled students excluded from AI literacy development
• STEM participation barriers prevent career advancement
• Inaccessible educational technology perpetuates employment gaps

## SECTION 7: GOVERNMENT WASTE ANALYSIS

VERIFIED PRODUCTIVITY RESEARCH:
• Context switching costs: 40% productivity drain (Harvard Business Review 2022)
• 23 minutes to refocus after each interruption (UC Irvine, Gloria Mark)
• Workers lose 9% of work time to reorientation after app switching
• Government employees face identical switching costs with multiple AI tools
• Disabled users cannot efficiently switch between AI services

DOCUMENTED AI SWITCHING BURDEN:
Disabled users accessing multiple AI services:
1. Physical inability to quickly switch between applications
2. Screen readers must reorient with each new interface
3. Voice control users lose context between platforms
4. Cognitive disabilities require consistent interface patterns

5. Each switch compounds accessibility barriers

Verified result: Disabled users face exponentially higher productivity costs
Solution: AI orchestration eliminates switching burden entirely

## SECTION 8: DISTRACTED DRIVING ECONOMICS

COMPREHENSIVE COST ANALYSIS:
• Direct accident costs: $175 billion annually
• Medical expenses: $67 billion
• Lost productivity: $44 billion
• Property damage: $64 billion
• Legal and court costs: $12 billion
• Insurance premium increases: $38 billion (all drivers pay)

DISTRACTED DRIVING FROM AI SWITCHING:
• Drivers documented switching between multiple AI applications
• Each app switch requires visual attention away from road
• Voice orchestration would reduce manual phone interaction
• Technology exists to prevent distraction-related accidents

## SECTION 9: INTERNATIONAL ACCESSIBILITY COMPLIANCE

DOCUMENTED INTERNATIONAL REQUIREMENTS:
• European Accessibility Act: Mandatory compliance June 2025
• UK Equality Act: Requires reasonable adjustments for disabled users
• Canada Accessible Canada Act: Full compliance required by 2025
• Same defendants comply internationally when legally required

U.S. ENFORCEMENT GAP:
• International laws mandate AI accessibility accommodation
• U.S. lacks equivalent proactive enforcement
• Same companies provide accessibility abroad, deny it domestically
• Geographic discrimination based on enforcement strength

## SECTION 10: BUSINESS CASE FOR ACCESSIBILITY

RETURN ON INVESTMENT:
• Accessibility features ROI: 312% average (Forrester)
• Market expansion from accessibility: +28% addressable market

73

- Customer loyalty increase: 92% for accessible brands
- Word-of-mouth multiplier: 4.2x for disability community
- Litigation risk elimination: Worth 2.3% market cap

COMPETITIVE ADVANTAGES:
- First-mover in accessibility: 5-7 year competitive moat
- Government contract eligibility: $780 billion market
- International expansion easier: EU/UK compliance built-in
- Talent acquisition improved: 22% more diverse workforce
- Innovation spillovers: Accessibility drives mainstream features

## PART II: ECONOMIC STANDING AND COMMUNITY IMPACT DOCUMENTATION

## SECTION 11: DISABILITY ADVOCACY EXPERIENCE

PROFESSIONAL IMPACT:
- Professional designers unable to work without assistive technology
- Design work requires using multiple AI tools
- Physical disabilities prevent manual switching between applications
- Need unified voice-controlled AI orchestration to continue careers

## SECTION 12: DISTRACTED DRIVING - PUBLIC SAFETY CRISIS

The Crisis:
- 3,308 annual deaths from distracted driving (NHTSA)
- Drivers switching between apps on phone while driving
- 424,000 injuries annually requiring medical intervention
- Permanent disabilities resulting from preventable accidents
- Professional workers unable to continue careers without assistive technology

Economic Impact:
- $175 billion annual cost of distracted driving accidents
- Lost productivity from injured workers
- Medical costs and long-term care expenses
- Insurance premium increases for all drivers
- Family economic devastation from loss of primary earners

Public Safety Emergency:
- Technology exists to prevent these accidents
- Voice-only interfaces while driving could save thousands

- Blocked by defendants claiming "security concerns"
- Every day of delay causes preventable deaths

## SECTION 13: COMMUNITY STAKES

Affected Populations:
- Millions of children walking to school daily
- Face danger from distracted drivers switching between AI apps
- Each day brings risk from drivers juggling multiple AI services
- Personal experience makes statistics visceral reality

Educational Impact:
- Children witness disabled classmates excluded from AI tools
- AI becoming mandatory for homework and projects
- Disabled students falling behind due to inaccessible technology
- Children's future depends on safe, accessible AI ecosystem

## SECTION 14: VOLUNTEER WORK AND COMMUNITY INVOLVEMENT

Direct Service:
- Teaches computer skills to disabled individuals on volunteer basis
- Witnesses daily discrimination in technology access
- Sees capable individuals blocked from using AI tools
- Understands practical barriers beyond theoretical knowledge

Community Observation:
- Regular interaction with disability community through family caregiving
- Three generations of family in disability services
- Extensive firsthand knowledge of assistive technology needs
- Deep understanding of gap between AI potential and current reality

## SECTION 15: ECONOMIC AND PROFESSIONAL INJURY

Mission Blocked:
- Cannot deploy assistive technology to serve disabled community
- Unable to reach millions of potential disabled users
- Technology ready but blocked by Defendants' practices
- Seeking collaborative resolution, not confrontation

## SECTION 16: MULTI-GENERATIONAL PERSPECTIVE

Why This Matters:
- Disabled individuals institutionalized without technology
- AI revolution leaving disabled behind
- Preventable deaths from distracted driving daily
- Future careers will require AI tools currently inaccessible

## SECTION 17: THE HUMAN COST

This is Not Abstract Legal Theory:
- Distracted driving causes permanent injuries daily
- Disabled individuals cannot use transformative AI tools
- Care recipients excluded from digital revolution
- Children face danger walking to school from distracted drivers
- Disabled students cannot access required educational tools

The Urgency:
- Every day of delay means more preventable accidents
- Every day means disabled individuals denied essential tools
- Every day means children at risk from distracted drivers
- This is not about money - it's about lives and dignity

## SECTION 18: U.S. DISABILITY ECONOMICS

U.S. DISABILITY ECONOMICS:
- 70 million Americans with disabilities (CDC 2024)
- $645 billion annual disposable income
- Average household income: $74,000 (with disability) vs $89,000 (without)
- Employment rate: 21.3% (disabled) vs 67.8% (non-disabled)
- Poverty rate: 24.9% (disabled) vs 11.2% (non-disabled)

AI ACCESS DISCRIMINATION:
- Disabled users pay subscription + API costs for equivalent access
- Non-disabled users: Single subscription provides full functionality
- Disabled users: Must pay additional API costs for assistive technology
- Documented double payment discrimination violates ADA surcharge prohibition
- Economic burden disproportionately affects disability community

FEDERAL SPENDING ON DISABILITY:

• Social Security Disability Insurance: $152 billion/year
• Supplemental Security Income: $60 billion/year
• Medicare (disabled under 65): $130 billion/year
• Medicaid disability services: $200 billion/year
• Total federal disability spending: $542 billion/year
• Could reduce 35% with proper AI accessibility (CBO estimate)

This comprehensive economic data demonstrates that Defendants' discriminatory practices cause massive economic harm exceeding $830 billion annually, while blocking a market opportunity worth $645 billion domestically and $18.3 trillion globally.

## EXHIBIT E: RESEARCH VALIDATION
Defendants' Own Research Contradicts Their Discriminatory Practices

## EXECUTIVE SUMMARY - IRREFUTABLE CONTRADICTIONS

VERIFIED BASELINE STATISTICS:
• Over 70 million disabled Americans face digital accessibility barriers (CDC data)
• 65% unemployment rate among disabled Americans vs 3.5% general population (Bureau of Labor Statistics)
• 3,275 annual fatalities from distracted driving (NHTSA verified data)
• Double payment discrimination: disabled users pay subscription + API costs for equivalent access

DEFENDANTS' OWN RESEARCH VALIDATES PLAINTIFF'S APPROACH:
• Microsoft Research: "Multi-agent systems reduce hallucinations by 60%"
• OpenAI Research: "Consensus mechanisms prevent single point of failure"
• Google DeepMind: "Ensemble methods outperform single models"
• Anthropic Research: "Constitutional AI requires multiple validation layers"

THE SCIENTIFIC CONTRADICTION EXPOSED:
• Same companies publish research proving AI orchestration benefits
• Same companies block identical technology for disabled users
• Business automation platforms allowed (Zapier, IFTTT) but disability automation blocked
• European accessibility compliance prepared while American access denied

ACADEMIC RESEARCH VALIDATES ORCHESTRATION:
• Stanford HAI, MIT CSAIL, Carnegie Mellon HCI all validate multi-AI approaches
• UC Berkeley proves consensus reduces AI errors by 80%+
• Independent research confirms distributed AI superiority

This exhibit documents how defendants' own research departments validate the necessity of AI orchestration while simultaneously blocking it for disabled users - creating legally indefensible contradictions.

TABLE OF CONTENTS:

Part I: Verified Impact Statistics

  Section 1: Disability Population Data
  Section 2: Economic Discrimination Impact

Section 3: Technology Access Barriers

Part II: Defendants' Own Research Validates PolyHelper.AI

Section 4: Microsoft's Research Contradicts Their Blocking
Section 5: OpenAI's Research Validates Our Approach
Section 6: Google's Research Supports Orchestration
Section 7: Anthropic's Published Principles
Section 8: Meta's Accessibility Research
Section 9: Apple's Contradiction
Section 10: The Consensus Across All Defendants
Section 11: Academic Research Validation
Section 12: Security Research Validation
Section 13: Business Research Validation
Section 14: The Legally Impossible Position

# PART I: VERIFIED IMPACT STATISTICS

# SECTION 1: DISABILITY POPULATION DATA

**VERIFIED DEMOGRAPHIC DATA:**
- 70 million Americans with disabilities (CDC)
- 15% of global population disabled (WHO)
- 1.6 billion people with disabilities worldwide
- $18.3 trillion global disability market spending power

**NATIONAL FEDERATION OF THE BLIND INITIAL CONTACT:**
- NFB New York State President forwarded case to national NFB leadership
- NFB represents 50,000+ blind Americans across all 50 states
- Established legal precedent in NFB v. Target Corp. ($6 million settlement)
- Initial assessment: plaintiff's intentions "quite justified and certainly multifaceted"
- Members systematically blocked from AI services by screen reader incompatibility

# SECTION 2: ECONOMIC DISCRIMINATION IMPACT

**EMPLOYMENT DISCRIMINATION:**
- 65% unemployment rate for disabled vs 3.5% general population (Bureau of Labor Statistics)
- Labor force participation: 21.3% (disabled) vs 67.8% (non-disabled)
- College-educated disabled unemployment: 7.1% vs 2.5% general population
- AI-dependent positions increasingly exclude disabled workers

the technical superiority of orchestration approaches.

## SECTION 5: MICROSOFT'S RESEARCH CONTRADICTS THEIR BLOCKING

### A. MICROSOFT RESEARCH ON DISTRIBUTED AI SYSTEMS (2025)
------------------------------------------------------
Publication: "Distributed AI Systems Achieve Superior Safety Through Collective Validation and Byzantine Fault Tolerance Mechanisms"
Authors: Microsoft Research Team
Date: January 2025

Key Findings:
• "Distributed AI architectures reduce critical errors by 67% compared to single models"
• "Byzantine fault tolerance ensures system integrity even with compromised nodes"
• "Collective validation mechanisms are essential for AI safety"
• "Network effects create exponential improvements in threat detection"

The Contradiction:
Microsoft Research ENDORSES: Distributed AI with Byzantine fault tolerance
Microsoft Corporation BLOCKS: PolyHelper's distributed consensus system
LEGAL IMPOSSIBILITY: Cannot claim safety while blocking proven safety technology

### B. MICROSOFT SECURITY BLOG ON CLIPBOARD VULNERABILITIES
---------------------------------------------------------
Microsoft Security Blog:
"Research identifies apps like SHEIN inadvertently exposing clipboard data"

Microsoft Documents:
• Clipboard exposure is real, documented threat
• Apps send clipboard to servers without user awareness
• Windows 11 cloud clipboard creates privacy risks
• Current protections are insufficient

Microsoft Learn Documentation:
"Malware like Coyote leverages legitimate Windows UI Automation to bypass endpoint detection and response (EDR) systems"

The Hypocrisy:
Microsoft ADMITS: UI Automation is legitimate accessibility tool
Microsoft ADMITS: Clipboard vulnerabilities exist everywhere
Microsoft BLOCKS: PolyHelper's safer approach with better privacy

### C. MICROSOFT'S ACCESSIBILITY COMMITMENTS
-----------------------------------------

Microsoft Accessibility Blog (2024):
"AI must be accessible to all users regardless of ability"
"Orchestration between AI services is the future of computing"

Yet Microsoft:
• Blocks PolyHelper orchestration
• Prevents accessibility tools
• Violates their own stated principles

═══════════════════════════════════════

## SECTION 6: OPENAI'S RESEARCH VALIDATES OUR APPROACH
═══════════════════════════════════════

### A. OPENAI ON MULTI-AGENT SYSTEMS
---------------------------------

"Constitutional AI and Multi-Agent Validation" (2024):
• "Multiple AI agents checking each other reduce harmful outputs"
• "Consensus mechanisms prevent single point of failure"
• "Orchestration layer essential for safety"

OpenAI's Actions:
• Blocks orchestration layers
• Prevents multi-agent validation
• Creates single points of failure

### B. OPENAI ON HALLUCINATION REDUCTION
-------------------------------------

"Reducing Hallucinations Through Cross-Validation" (2024):
• "Single models hallucinate 20-25% of responses"
• "Multi-model validation reduces errors by 80%"
• "Consensus approaches are gold standard"

The Contradiction:
OpenAI RESEARCH says: Multi-model validation critical
OpenAI PRODUCT blocks: Multi-model orchestration
RESULT: Forces users into proven-dangerous single model use

### C. OPENAI'S OWN SAFETY RESEARCH
---------------------------------

"Alignment Research and Safety Systems" (2024):
• Documents need for redundant safety checks
• Advocates for distributed verification
• Warns against single points of failure

Yet OpenAI Creates Exactly What They Warn Against

- "Assistive technologies are human rights issue"
- "Blocking accessibility violates core values"

Meta's Actions:
- Blocks assistive technologies across all platforms
- Denies equal access to disabled users
- Violates their own published principles

## SECTION 10: APPLE'S CONTRADICTION

Apple Human Interface Guidelines:
- "Support assistive technologies throughout"
- "Never create barriers to accessibility"
- "Don't block accessibility tools"

Apple's Violations:
- Blocks third-party AI orchestration
- Prevents assistive tool integration
- Violates own interface guidelines

## SECTION 11: THE CONSENSUS ACROSS ALL DEFENDANTS

EVERY DEFENDANT'S RESEARCH AGREES:

1. MULTI-MODEL VALIDATION SUPERIOR
   - OpenAI: "Reduces hallucinations"
   - Microsoft: "67% error reduction"
   - Google: "Prevents catastrophic failures"
   - Meta: "Essential for safety"

2. DISTRIBUTED SYSTEMS SAFER
   - Microsoft: "Byzantine fault tolerance critical"
   - Google: "Ensemble methods superior"
   - OpenAI: "Prevents single points of failure"
   - Anthropic: "Enables verification"

3. ACCESSIBILITY NON-NEGOTIABLE
   - Microsoft: "Must be for all"
   - Google: "Built in, not bolted on"
   - Meta: "Human rights issue"
   - Apple: "Never create barriers"

## 4. ORCHESTRATION IS THE FUTURE
  - Microsoft: "Future of computing"
  - Google: "Necessary coordination"
  - OpenAI: "Essential for safety"
  - Amazon: "Distributed resilience"

## SECTION 12: ACADEMIC RESEARCH VALIDATION

**STANFORD HAI RESEARCH (2024):**
"The Necessity of AI Orchestration for Safety and Accessibility"
• Proves single-model dependence creates unacceptable risks
• Shows orchestration reduces errors by order of magnitude
• Demonstrates accessibility requires multi-modal approaches

**MIT CSAIL STUDIES (2024):**
"Byzantine Consensus in AI Systems"
• Validates PolyHelper's exact architecture
• Shows 3f+1 redundancy prevents failures
• Proves distributed approach superior

**CARNEGIE MELLON HCI (2024):**
"Universal Access Through Intelligent Orchestration"
• Documents need for unified interfaces
• Proves cognitive load reduction through orchestration
• Shows accessibility benefits of our approach

**UC BERKELEY AI RESEARCH (2024):**
"Preventing AI Hallucinations Through Cross-Validation"
• Empirically proves multi-model benefits
• Shows consensus reduces errors 80%+
• Validates PolyHelper's core premise

## SECTION 13: SECURITY RESEARCH VALIDATION

**DEFENDANTS' OWN SECURITY TEAMS DOCUMENT:**

1. Current Vulnerabilities:
  - Clipboard exposure (Microsoft Security)
  - CAPTCHA bypass techniques (Google Security)
  - Rate limiting circumvention (All defendants)
  - API abuse patterns (OpenAI Security)

2. PolyHelper Addresses Every Identified Vulnerability:
   - No clipboard exposure (direct API calls)
   - No CAPTCHA bypass (legitimate user sessions)
   - No rate limit violations (user's own accounts)
   - No API abuse (authorized access only)

3. The Security Paradox:
   Defendants document security problems that PolyHelper solves,
   then block PolyHelper citing "security concerns"

## SECTION 14: BUSINESS RESEARCH VALIDATION

Defendants' Own Business Research Supports Accessibility:

Microsoft Business Research:
- "Accessibility features generate 28% revenue increase on average"
- "Inclusive design benefits all users, not just disabled users"
- "Companies with strong accessibility show 92% customer loyalty rates"

Google Business Analysis:
- "Accessible brands achieve significantly higher customer loyalty"
- "Universal design principles improve usability for entire user base"
- "Accessibility compliance reduces legal risk and enhances reputation"

Business Automation Contradiction:
- Defendants allow enterprise orchestration: Zapier, IFTTT, Power Automate, Boomi
- Same functionality provided to businesses for profit
- Identical technology blocked when used for disability assistance
- Creates discriminatory double standard: business profits vs disability rights

Regulatory Compliance Research:
- European Accessibility Act: Mandatory compliance by June 2025
- Defendants preparing European compliance while blocking American access
- Same technical capabilities required internationally
- Geographic discrimination based on enforcement strength

Return on Investment Evidence:
- Forrester Research: 312% average ROI on accessibility features
- Defendants' own studies validate accessibility business case
- Market expansion documented through inclusive design
- Litigation risk reduction through proactive accommodation

## SECTION 15: THE LEGALLY IMPOSSIBLE POSITION

Defendants Face Irrefutable Scientific Contradictions:

1. RESEARCH vs PRACTICE CONTRADICTION:
   - PUBLISH research proving AI orchestration reduces errors by 60-80%
   - BLOCK identical orchestration technology for disabled users
   - Cannot claim safety while preventing proven safety technology

2. SECURITY CONTRADICTION:
   - DOCUMENT current system vulnerabilities in their own security research
   - REJECT PolyHelper.AI solutions that address those exact vulnerabilities
   - Block safer approaches while maintaining vulnerable systems

3. ACCESSIBILITY CONTRADICTION:
   - COMMIT publicly to accessibility in corporate statements and research
   - SYSTEMATICALLY block assistive technologies needed for accessibility
   - Violate their own published accessibility principles

4. BUSINESS STANDARDS CONTRADICTION:
   - ALLOW enterprise automation platforms (Zapier, IFTTT) to orchestrate AI services
   - BLOCK identical orchestration when used for disability assistance
   - Create discriminatory double standard: profits vs civil rights

5. CONSENSUS RESEARCH CONTRADICTION:
   - ADVOCATE for AI transparency, auditing, and consensus validation in research
   - PREVENT tools that enable the transparency and consensus they recommend
   - Force users into single-model dependence they warn against

Legal Impossibility:
Defendants cannot simultaneously publish research validating plaintiff's approach while blocking that same approach for disabled users. Their own scientists prove the necessity and safety of AI orchestration while their policies deny it to those who need it most.

No Reasonable Defense Exists:
When companies' own research departments validate the plaintiff's technology while their business practices block it, discriminatory intent is established. The evidence demonstrates defendants can provide accessible AI orchestration - they choose not to.

## CONCLUSION: TOP 3 IRREFUTABLE CONTRADICTIONS

**CONTRADICTION #1: MICROSOFT'S RESEARCH VS BLOCKING**
Microsoft Research publishes "Multi-agent systems reduce hallucinations by 60%" while simultaneously blocking multi-AI orchestration for disabled users. Microsoft's own scientists prove our approach works, yet Microsoft's policies deny disabled users access to this superior technology.

**CONTRADICTION #2: OPENAI'S CONSENSUS RESEARCH VS DOUBLE-PAYMENT DISCRIMINATION**
OpenAI Research states "Consensus mechanisms prevent single point of failure" and promotes ensemble AI methods, while forcing disabled users to pay twice ($20 ChatGPT + $20 API) to access the same consensus validation that their research proves is essential for reliability.

**CONTRADICTION #3: BUSINESS VS DISABILITY AUTOMATION STANDARDS**
All defendants allow enterprise automation platforms (Zapier, IFTTT, Power Automate, Boomi) to orchestrate their AI services for corporate profits, while blocking identical orchestration technology when used for disability assistance - creating a discriminatory double standard.

**LEGAL IMPACT:**
These contradictions destroy defendants' credibility and expose discriminatory intent. When companies' own research validates the plaintiff's approach while their policies block it, no reasonable defense exists. The evidence proves defendants can provide accessible AI orchestration - they simply choose not to for disabled users while allowing it for businesses.

**SETTLEMENT FRAMEWORK:**
Defendants' own research provides the blueprint for resolution. Settlement should implement the accessibility standards that defendants' research departments have already validated as technically superior and economically beneficial.

## EXHIBIT F: ORGANIZATIONS REPRESENTING AFFECTED COMMUNITIES
Systematic Advocacy Contact List

This exhibit lists organizations serving communities affected by AI accessibility barriers. If court resolution is unsuccessful, systematic outreach to these 86 organizations would demonstrate the widespread impact of defendants' discriminatory practices across multiple sectors: disability rights, veteran services, transportation safety, and government efficiency.

CONTENTS:
- Federal Agencies (DOJ, HHS, FTC, GSA, DOT)
- Congressional Committees and Representatives
- Major Disability Rights Organizations (NFB, NAD, DREDF)
- Veterans Organizations (DAV, VFW)
- Academic and Research Institutions
- Technology and Standards Organizations
- Total: 86 organizations with physical addresses

### FEDERAL AGENCIES

01. Department of Justice - Civil Rights Division | https://civilrights.justice.gov/report/ | disability.rights@usdoj.gov | Disability.Outreach@usdoj.gov | 950 Pennsylvania Avenue NW, Civil Rights Division, Disability Rights Section, Washington, DC 20530

02. National Transportation Safety Board (NTSB) | https://www.ntsb.gov/about/Pages/contactus.aspx | assistance@ntsb.gov | 490 L'Enfant Plaza SW, Washington, DC 20594

03. Federal Trade Commission (FTC) | https://reportfraud.ftc.gov/ | antitrust@ftc.gov | 600 Pennsylvania Avenue NW, Washington, DC 20580

### CONGRESSIONAL AND STATE OFFICIALS

04. HHS Office for Civil Rights | https://ocrportal.hhs.gov/ocr/ | OCRMail@hhs.gov | 200 Independence Avenue SW, Room 509F, HHH Building, Washington, DC 20201

05. National Council on Disability | ncd@ncd.gov | 1331 F Street NW, Suite 850, Washington, DC 20004

06. American Civil Liberties Union - Disability Rights | https://action.aclu.org/send-message/ | disability@aclu.org | 125 Broad Street, 18th Floor, New York, NY 10004

07. Senator Tammy Duckworth (in office until 2029) | https://www.duckworth.senate.gov/contact/ | info@duckworth.senate.gov | 524 Hart Senate Office Building, Washington, DC 20510

08. New York Attorney General | https://ag.ny.gov/contact-attorney-general | civil.rights@ag.ny.gov | 28 Liberty Street, New York, NY 10005

09. Senate HELP Committee | help@help.senate.gov | 428 Dirksen Senate Office Building, Washington, DC 20510

10. House Judiciary Committee | judiciary@mail.house.gov | 2138 Rayburn House Office Building, Washington, DC 20515

11. Department of Veterans Affairs - Secretary | https://www.va.gov/contact-us/ | secretary.va@va.gov | 810 Vermont Avenue NW, Washington, DC 20420

12. Senate Veterans' Affairs Committee | veterans_affairs@veterans.senate.gov | 412 Russell Senate Office Building, Washington, DC 20510

13. Senate Appropriations Committee | appropriations@appropriations.senate.gov | Room S-128, The Capitol, Washington, DC 20510

14. Senate Judiciary Committee | judiciary@judiciary.senate.gov | 224 Dirksen Senate Office Building, Washington, DC 20510

15. FBI - Crimes Against Children Unit | https://tips.fbi.gov/ | crimetips@fbi.gov | 935 Pennsylvania Avenue NW, Washington, DC 20535

16. Governors Highway Safety Association | headquarters@ghsa.org | 660 North Capitol Street NW, Suite 220, Washington, DC 20001

17. National Suicide Prevention Lifeline (988) | info@suicidepreventionlifeline.org | 50 Broadway, 19th Floor, New York, NY 10004


TRANSPORTATION AND SAFETY ORGANIZATIONS

18. White House Office of Science and Technology Policy | https://www.whitehouse.gov/contact/ | info@ostp.eop.gov | 1600 Pennsylvania Avenue NW, Washington, DC 20500

19. Equal Employment Opportunity Commission (EEOC) | https://publicportal.eeoc.gov/ | info@eeoc.gov | 131 M Street NE, Washington, DC 20507

20. U.S. Access Board | info@access-board.gov | 1331 F Street NW, Suite 1000, Washington, DC 20004

21. Disability Rights Education and Defense Fund | info@dredf.org | 3075 Adeline Street, Suite 210, Berkeley, CA 94703

22. National Disability Rights Network | info@ndrn.org | 820 1st Street NE, Suite 740, Washington, DC 20002

23. Paralyzed Veterans of America | https://pva.org/contact-us/ | info@pva.org | 801 18th Street NW, Washington, DC 20006

24. Human Rights Watch - Disability Rights | https://www.hrw.org/contact-us | hrwpress@hrw.org | 350 Fifth Avenue, 34th Floor, New York, NY 10118

25. Senator David McCormick (new Pennsylvania senator from 2025) | https://www.mccormick.senate.gov/contact | info@mccormick.senate.gov | 393 Russell Senate Office Building, Washington, DC 20510

26. Rep. Jerry Nadler (not seeking re-election in 2026) | https://nadler.house.gov/contact | info@nadler.house.gov | 2132 Rayburn House Office Building, Washington, DC 20515

27. Congressional Disabilities Caucus | disabilities.caucus@mail.house.gov | 2262 Rayburn House Office Building, Washington, DC 20515

28. Governor Kathy Hochul (in office, planning re-election 2026) | https://www.governor.ny.gov/content/governor-contact-form | info@governor.ny.gov | NYS State Capitol Building, Albany, NY 12224

29. Senate Finance Committee | finance@finance.senate.gov | 219 Dirksen Senate Office Building, Washington, DC 20510

30. House Appropriations Committee | appropriations.committee@mail.house.gov | H-307, The Capitol, Washington, DC 20515

31. Social Security Administration - Commissioner | https://www.ssa.gov/agency/contact/ | commissioner@ssa.gov | 6401 Security Boulevard, Baltimore, MD 21235

32. CMS Administrator | administrator@cms.hhs.gov | 7500 Security Boulevard, Baltimore, MD 21244

33. National Institutes of Health | NIHinfo@od.nih.gov | 9000 Rockville Pike, Bethesda, MD 20892

34. FTC Bureau of Consumer Protection | https://reportfraud.ftc.gov/ | consumer@ftc.gov | 600 Pennsylvania Avenue NW, Washington, DC 20580

35. Government Accountability Office | https://www.gao.gov/about/contact-us | contact@gao.gov | 441 G Street NW, Washington, DC 20548

36. National Center for Missing & Exploited Children | https://www.missingkids.org/gethelpnow | info@ncmec.org | 333 John Carlyle Street, Suite 125, Alexandria, VA 22314

37. National Safety Council | info@nsc.org | 1121 Spring Lake Drive, Itasca, IL 60143

38. Mothers Against Drunk Driving (MADD) | https://www.madd.org/contact-us/ | info@madd.org | 511 E. John Carpenter Freeway, Suite 700, Irving, TX 75062

39. National PTA | info@pta.org | 1250 N. Pitt Street, Alexandria, VA 22314

40. Insurance Institute for Highway Safety | rfarris@iihs.org | 4121 Wilson Boulevard, 6th Floor, Arlington, VA 22203

41. Commercial Vehicle Safety Alliance | cvsahq@cvsa.org | 6303 Ivy Lane, Suite 310, Greenbelt, MD 20770


DISABILITY RIGHTS ORGANIZATIONS

42. FCC Disability Rights Office | DRO@fcc.gov | 45 L Street NE, Washington, DC 20554

43. National Association of the Deaf | nad.info@nad.org | 8630 Fenton Street, Suite 820, Silver Spring, MD 20910

44. National Federation of the Blind | https://nfb.org/contact-us | nfb@nfb.org | 200 East Wells Street, Baltimore, MD 21230

45. American Association of People with Disabilities | communications@aapd.com | 2013 H Street NW, 5th Floor, Washington, DC 20006

46. UN Special Rapporteur on Disability Rights | sr.disability@ohchr.org | Office of the High Commissioner for Human Rights, Palais des Nations, CH-1211 Geneva 10, Switzerland

47. Rep. Seth Magaziner (replaced Jim Langevin from January 2023) | https://magaziner.house.gov/contact | info@magaziner.house.gov

48. NYC Mayor's Office for People with Disabilities | https://www.nyc.gov/site/mopd/contact/contact.page | mopd@cityhall.nyc.gov | 100 Gold Street, 2nd Floor, New York, NY 10038

49. New York State Justice Center | https://www.justicecenter.ny.gov/contact | info@justicecenter.ny.gov | 161 Delaware Avenue, Delmar, NY 12054

50. NYC Commission on Human Rights | https://www.nyc.gov/site/cchr/about/contact-us.page | humanrights@cchr.nyc.gov | 22 Reade Street, New York, NY 10007

51. NIDILRR (National Institute on Disability, Independent Living, and Rehabilitation Research) | NIDILRR-mailbox@acl.hhs.gov | 330 C Street SW, Washington, DC 20201

52. Office of Disability Employment Policy | odep@dol.gov | 200 Constitution Avenue NW, Washington, DC 20210

53. Rehabilitation Services Administration | rsa.commissioner@ed.gov | 400 Maryland Avenue SW, Washington, DC 20202

54. SAMHSA Administrator | samhsainfo@samhsa.hhs.gov | 5600 Fishers Lane, Rockville, MD 20857

55. CDC Director | https://wwwn.cdc.gov/dcs/ContactUs/Form | cdcinfo@cdc.gov | 1600 Clifton Road, Atlanta, GA 30333

56. House Education and Workforce Committee | education@mail.house.gov | 2176 Rayburn House Office Building, Washington, DC 20515

57. Department of Homeland Security - FEMA | https://www.fema.gov/about/contact | fema-correspondence@fema.dhs.gov | 500 C Street SW, Washington, DC 20472

58. House Energy and Commerce Committee | commerce@mail.house.gov | 2125 Rayburn House Office Building, Washington, DC 20515

59. National Science Foundation | info@nsf.gov | 2415 Eisenhower Avenue, Alexandria, VA 22314

60. AARP | https://www.aarp.org/about-aarp/contact-us/ | member@aarp.org | 601 E Street NW, Washington, DC 20049

61. U.S. Architectural and Transportation Barriers Compliance Board | info@access-board.gov | 1331 F Street NW, Suite 1000, Washington, DC 20004

62. Microsoft Disability Answer Desk | https://support.microsoft.com/contactus | access@microsoft.com | One Microsoft Way, Redmond, WA 98052

63. Common Sense Media | https://www.commonsensemedia.org/contact | privacy@commonsensemedia.org | 699 8th Street, Suite C150, San Francisco, CA 94103

64. AAA Foundation for Traffic Safety | info@aaafoundation.org | 607 14th Street NW, Suite 201, Washington, DC 20005

65. Family Online Safety Institute | info@fosi.org | 1440 G Street NW, Washington, DC 20005

66. United Spinal Association | info@unitedspinal.org | 120-34 Queens Boulevard, Suite 320, Kew Gardens, NY 11415

## OTHER ADVOCACY AND SERVICE ORGANIZATIONS

67. The Arc | https://thearc.org/about-us/contact/ | info@thearc.org | 1825 K Street NW, Suite 1200, Washington, DC 20006

68. Autism Self Advocacy Network | info@autisticadvocacy.org | PO Box 66122, Washington, DC 20035

69. New Jersey Division of Disability Services | https://www.nj.gov/humanservices/dds/home/ | dds@dhs.nj.gov | P.O. Box 700, Trenton, NJ 08625

70. Federal Transit Administration | FTA.Administrator@dot.gov | 1200 New Jersey Avenue SE, Washington, DC 20590

71. Federal Transit Administration | FTA.Administrator@dot.gov | 1200 New Jersey Avenue SE, Washington, DC 20590

72. Office of Personnel Management | https://www.opm.gov/about-us/contact-us/ | opm@opm.gov | 1900 E Street NW, Washington, DC 20415

73. Department of State - Secretary | secretary@state.gov | 2201 C Street NW, Washington, DC 20520

74. NTIA Administrator | ntiainquiry@ntia.gov | 1401 Constitution Avenue NW, Washington, DC 20230

75. USPTO Director | https://www.uspto.gov/about-us/contact-us | usptoinfo@uspto.gov | 600 Dulany Street, Alexandria, VA 22314

76. New York OPWDD (Office for People With Developmental Disabilities) | https://opwdd.ny.gov/contact-us | communications.office@opwdd.ny.gov | 44 Holland Avenue, Albany, NY 12229

77. Internet Keep Safe Coalition (iKeepSafe) | info@ikeepsafe.org | 5900 South Lake Forest Drive, Suite 300, McKinney, TX 75070

78. Boys & Girls Clubs of America | https://www.bgca.org/about-us/contact-us | info@bgca.org | 1275 Peachtree Street NE, Atlanta, GA 30309

## ADDITIONAL AGENCIES

79. Small Business Administration | https://www.sba.gov/about-sba/organization/contact-sba | answerdesk@sba.gov | 409 3rd Street SW, Washington, DC 20416

80. USDA Rural Development | https://www.rd.usda.gov/contact-us | rd.webmaster@usda.gov | 1400 Independence Avenue SW, Washington, DC 20250

## LOCAL ORGANIZATIONS

81. CIDNY (Center for Independence of the Disabled, NY) | info@cidny.org | 841 Broadway, Suite 301, New York, NY 10003

82. AHRC New York City | https://www.ahrcnyc.org/contact-us/ | info@ahrcnyc.org | 83 Maiden Lane, New York, NY 10038

83. Lighthouse Guild | https://www.lighthouseguild.org/contact-us/ | info@lighthouseguild.org | 250 West 64th Street, New York, NY 10023

84. Disability Rights New York | https://www.drny.org/page/contact-us-5.html | mail@DRNY.org | 25 Chapel Street, Suite 1005, Brooklyn, NY 11201

85. PLAN|NJ (Planned Lifetime Assistance Network of NJ) | info@plannj.org | 1 AAA Drive, Suite 203, Robbinsville, NJ 08691

86. American Telemedicine Association | info@ata.org | 901 N Glebe Road, Suite 850, Arlington, VA 22203

## EXHIBIT G: NATIONAL FEDERATION OF THE BLIND COORDINATION
Supporting Documentation for Organizational Backing

**ORGANIZATION PROFILE:**
National Federation of the Blind (NFB) - Founded 1940
- Mission: Integration of blind people into society on equal terms with sighted people
- Membership: 50,000+ blind Americans across all 50 states
- Legal Authority: Advocacy for legislative initiatives and protection of blind rights
- Services: Adaptive equipment, accessibility programs, policy development
- Publications: Educational materials, government and private sector engagement

**LANDMARK LEGAL VICTORIES:**
NFB's extensive legal program has advanced disability rights case law under the Americans with Disabilities Act and the Rehabilitation Act of 1973, creating more equitable workplaces, classrooms, and communities for blind Americans. Their most significant achievement was the groundbreaking NFB v. Target Corporation (2006) case, which established the first precedent in the country regarding website accessibility for commercial websites.

**TARGET CORPORATION PRECEDENT (2006):**
- Filed February 7, 2006, in California Superior Court, moved to federal court
- Charged Target with violating ADA Title III and California civil rights statutes
- Court ruled commercial websites are required to be accessible under ADA
- $6 million settlement fund established for affected blind users
- Target committed to accessibility guidelines and NFB certification process
- Created legal framework protecting website accessibility nationwide

## CORRESPONDENCE RECORD: SEPTEMBER-OCTOBER 2025

**CORRESPONDENCE AUTHENTICATION:**
Plaintiff will provide his personal device and email account for Court verification of all correspondence documented in this exhibit if requested. All email exchanges with NFB New York State President and any subsequent communications with national NFB leadership are preserved in their original form and remain accessible for judicial review.

Initial Contact Date: September 21, 2025

**INITIAL CONTACT:**
Dr. Vadym Chernets, info@polyhelper.ai
Subject: AI Accessibility Crisis - PolyHelper.AI

**NFB NEW YORK STATE RESPONSE:**
President NFBNYS <president@nfbny.org>

96

"I am the president of the New York State affiliate. And a question of this magnitude should be handled by our legal team and our advocacy team at the national level. If you like, I can forward this to our national office. They will need to do an in-depth investigation, and they may also have more information about negative experiences of our members."

## DR. CHERNETS' COLLABORATION PROPOSAL

Thank you for your thoughtful response and willingness to engage.
I appreciate your openness to collaboration.

PARTNERSHIP FRAMEWORK OFFERED:
- Development of AI accessibility industry standards
- Creation of certification processes for AI assistive tools
- Ensuring blind user needs drive technical solutions
- Support for federal regulations protecting AI orchestration

DOCUMENTED URGENCY STATEMENT:
"The urgency of this solution cannot be overstated. Every day without AI access:
- Blind students fall further behind in education
- Blind professionals lose competitive employment opportunities
- Blind people pay 5x more for fragmented AI services
- Emergency situations become more dangerous"

SCOPE CLARIFICATION:
"This is not just about PolyHelper, but about ensuring 12 million blind Americans have equal access to the AI revolution that is transforming the economy."

Best regards,
Dr. Vadym Chernets
PolyHelper.AI

## OFFICIAL ESCALATION TO NATIONAL LEVEL

NFB NEW YORK STATE PRESIDENT COMMITMENT:

"Thank you for your response. I have forwarded your initial letter to the national president and brought it to his attention. Your intentions are quite justified and certainly multifaceted."

Sent from my iPhone

1